# ORIGINAL

Approved: _____
RUSSELL CAPONE / KAN M. NAWADAY / LAUREN B. SCHORR
Assistant United States Attorneys

Before:   HONORABLE KEVIN N. FOX
          United States Magistrate Judge
          Southern District of New York

**17 MAG 3037**

- - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                 :

          - v. -                         :

PAUL DEAN,                               :
ROBERT ESPINEL, and
GAETANO VALASTRO,                        :
  a/k/a "Guy,"                           :

     Defendants.                         :

- - - - - - - - - - - - - - -x

SEALED
COMPLAINT

Violations of
18 U.S.C. §§ 666, 371,
1951, 1001 & 2

County of Offense:
New York

SOUTHERN DISTRICT OF NEW YORK, ss.:

          JOSEPH DOWNS, being duly sworn, deposes and says that
he is a Special Agent with the Federal Bureau of Investigation
("FBI") and charges as follows:

## COUNT ONE
### (Conspiracy to Commit Bribery)

          1.    From in or about 2014, up through and including
in or about 2015, in the Southern District of New York and
elsewhere, PAUL DEAN, ROBERT ESPINEL, and GAETANO VALASTRO,
a/k/a "Guy," the defendants, and others known and unknown,
willfully and knowingly did combine, conspire, confederate and
agree together and with each other to commit offenses against
the United States, to wit, to violate Title 18, United States
Code, Section 666.

          2.    It was a part and an object of the conspiracy
that PAUL DEAN and ROBERT ESPINEL, the defendants, and others
known and unknown, being an agent of an organization, local
government or an agency thereof, corruptly solicited, and
demanded for the benefit of a person, and accepted and agreed to

accept, things of value from a person, intending to be influenced and rewarded in connection with business, transactions, and series of transactions of such organization, government, and agency involving a thing of value of $5,000 and more, in violation of Title 18, United States Code, Section 666(a)(1)(B), to wit, DEAN and ESPINEL, along with others in the New York City Police Department ("NYPD") License Division, agreed to solicit and accept bribes from GAETANO VALASTRO, the defendant, and others, in exchange for the assistance of DEAN, ESPINEL, and others in the License Division in approving, expediting the issuance of, and upgrading gun licenses, among other matters before the License Division.

        3.    It was further a part and an object of the conspiracy that GAETANO VALASTRO, a/k/a "Guy," the defendant, and others known and unknown, willfully and knowingly would and did corruptly give, offer, and agree to give a thing of value to a person, with intent to influence an agent of an organization, local government, or an agency thereof, in connection with business, transactions, and series of transactions of such organization, government, and agency involving a thing of value of $5,000 and more, in violation of Title 18, United States Code, Section 666(a)(2), to wit, VALASTRO agreed to pay bribes to DEAN, ESPINEL and others in exchange for their assistance in approving, expediting the issuance of, and upgrading gun licenses, among other matters before the License Division.

        4.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York:

        a.    In or about 2014, PAUL DEAN, the defendant, while employed as a Lieutenant by the NYPD and assigned to the NYPD License Division, received a payment of approximately $1,000 from a gun license expediter.

        b.    In or about 2015, ROBERT ESPINEL, the defendant, while employed as an NYPD police officer and assigned to the NYPD License Division, solicited and accepted firearms and a firearms training course from GAETANO VALASTRO, a/k/a "Guy," the defendant.

        c.    In or about 2015, DEAN and ESPINEL solicited and accepted food, alcohol, parties, dancers, and prostitutes from another gun license expediter.

d.    In or about 2015, VALASTRO gave cash and guns to a police officer who worked under DEAN in the NYPD License Division.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Conspiracy to Commit Bribery)

5.    From in or about November 2015, through in or about January 2016, in the Southern District of New York and elsewhere, PAUL DEAN, ROBERT ESPINEL, and GAETANO VALASTRO, a/k/a "Guy," the defendants, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, to violate Title 18, United States Code, Section 666.

6.    It was a part and an object of the conspiracy that PAUL DEAN, ROBERT ESPINEL, and GAETANO VALASTRO, a/k/a "Guy," the defendants, and others known and unknown, willfully and knowingly would and did corruptly give, offer, and agree to give a thing of value to a person, with intent to influence an agent of an organization, local government, or an agency thereof, in connection with business, transactions, and series of transactions of such organization, government, and agency involving a thing of value of $5,000 and more, to wit, DEAN and ESPINEL, while about to retire from the NYPD and become gun license expediters, worked with VALASTRO to offer to pay bribes to members of the NYPD's License Division to secure those members' assistance in approving gun license applications.

7.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York:

a.    In or about December 2015, PAUL DEAN and ROBERT ESPINEL, the defendants, met with two other NYPD police officers in the License Division to propose paying future bribes to those officers for their assistance.

b.    In or about December 2015, ESPINEL, while still employed at the NYPD, brought one of his and DEAN's clients to the License Division in order to process that individual's application for a gun license.

3

c.    In or about January 2016, GAETANO VALASTRO, a/k/a "Guy," the defendant, began allowing DEAN and ESPINEL to use VALASTRO's gun store as the location of their expediting business.

(Title 18, United States Code, Section 371.)

## COUNT THREE
### (Extortion Under Color of Official Right)

8.    In or about December 2015, in the Southern District of New York and elsewhere, PAUL DEAN and ROBERT ESPINEL, the defendants, willfully and knowingly did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, by extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), and attempted to do the same, to wit, DEAN and ESPINEL, using their positions as members of the NYPD, attempted to coerce at least one gun license expediter to pay kickbacks to DEAN and ESPINEL in exchange for their assistance in getting gun licenses approved.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT FOUR
### (False Statements)

9.    In or about October 2016, in the Southern District of New York, GAETANO VALASTRO, a/k/a "Guy," the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully falsified, concealed and covered up by trick, scheme, and device a material fact, and made a materially false, fictitious and fraudulent statement and representation, to wit, VALASTRO lied to officials from the Federal Bureau of Investigation and the United States Attorney's Office in response to questions about his relationship and dealings with members of the NYPD's License Division, including PAUL DEAN and ROBERT ESPINEL, the defendants.

(Title 18, United States Code, Section 1001.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

10.    I have been a Special Agent with the FBI for approximately 12 years.  I am currently assigned to a public corruption squad in the FBI's New York Field Office.  As a Special

4

Agent, I have participated in investigations involving the bribing of public officials and law enforcement officers.

11.   Since at least in or about 2013, I have been involved in an investigation being conducted jointly by the FBI and the Internal Affairs Bureau ("IAB") of the NYPD into, among other things, allegations of misconduct by law enforcement personnel.   IAB is the unit within the NYPD that investigates police misconduct.

12.   The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents.   Because this affidavit is prepared for limited purposes, I have not set forth each and every fact I have learned in connection with this investigation.   Where conversations and events are referred to herein, they are related in substance and in part.

### The NYPD License Division and Relevant Individuals

13.   Based on my discussions with relevant personnel of the NYPD, including officers in the NYPD License Division, my review of publicly available information, and my training and experience, I have learned the following:

a.   The NYPD License Division, located at One Police Plaza in Manhattan, is the entity within the NYPD responsible for approving or rejecting all applications for handgun licenses in New York City.

b.   During the time periods discussed herein, the License Division employed approximately 40 police personnel, including two Lieutenants, eight Sergeants, and 26 police officers.

c.   Among the types of handgun licenses issued by the NYPD License Division are (i) a premises license, which permits its holder to have a handgun in the holder's home (a "Premises License"); (ii) a license for retired law enforcement personnel (a "Retiree License"); (iii) a limited carry license, which permits its holder to have a handgun in the home or business and to carry the handgun for specified, limited purposes and at limited times (a "Limited Carry License"); and (iv) a full carry license, which permits its holder to carry a handgun anywhere in

New York State at all times, but only for justified business purposes (a "Full Carry License").

    d.  The NYPD License Division receives approximately 5,000 applications for gun licenses per year. Limited and Full Carry Licenses are a small fraction of the licenses issued by the NYPD License Division annually.

    e.  After an application is received, the NYPD License Division conducts an investigation of the applicant before electing to approve or reject the application.  The investigation includes (i) a review of the applicant's criminal history, including summonses, arrests, and convictions; (ii) a review of the applicant's mental health history; (iii) verification of the details of the application; (iv) an in-person interview of the applicant; and (v) an investigation into the business need for Limited and Full Carry Licenses.

    f.  Pursuant to New York State law, certain findings, such as a prior felony conviction, result in the automatic rejection of an applicant.  In addition, the NYPD License Division by law has discretion to reject gun license applications for additional reasons, such as moral character, mental health issues, or a history of substance abuse.  On its website, the NYPD License Division also indicates that it may reject applications if the investigation reveals a history of arrest, driving infractions, or domestic violence incidents, among other reasons.

    g.  Typically, the processing, investigation, and approval or rejection of an application takes several months.  For Limited and Full Carry Licenses, it can take even longer, and in the case of Full Carry Licenses, in excess of one year.

    h.  An "expediter" is an individual who charges clients to assist them in pursuing the gun licensing process with the NYPD.  As an official matter, the NYPD does not encourage applicants to use the services of expediters.  Specifically, the License Division website informs prospective applicants that:

> The License Division is aware that there are consulting companies which guarantee the issuance of a New York City handgun license . . . if a prospective applicant uses their services to complete the application form. These firms cannot obtain a handgun license . . . for you if you do not qualify, nor can they expedite your

6

application.  As an applicant, you should be aware that
such services are not required or endorsed by the New
York City Police Department and that only an attorney
licensed by the State of New York can represent you
before the License Division.

14.  NYPD rules prohibit personnel, including members of
the License Division, from accepting gifts or compensation in
connection with their work for the NYPD.  Specifically, I have
reviewed relevant portions of the NYPD's "Patrol Guide," which
provides, in part, as follows:

It is the policy of the Department that members of the
service may not accept any reward, gratuity, gift or
other compensation for any service performed as a result
of or in conjunction with their duties as public
servants. . . .  This policy applies regardless of
whether the service was performed while said members of
the Department were on or off duty.  Members of the
service also shall not solicit any gift, gratuity, loan,
present, fee or reward for personal gain. . . .  Members
of the service may be offered gifts, awards, and other
things of value by private citizens, institutions, etc.,
in appreciation for their police service.  It is not
unethical or illegal for a member of the service to
accept gifts that are commonly offered as tokens of
appreciation, *i.e.*, plaques, pen and pencil sets, etc.
However, cash rewards and personal gifts, such as
wristwatches, etc., are strictly forbidden.

### Relevant Individuals

15.  Based on my discussions with NYPD personnel, my
review of NYPD records, and my involvement in this investigation,
I have learned the following:

a.  PAUL DEAN, the defendant, was a member of the
NYPD from 1994 through January 2016, when he retired.  From
September 2008 through the time of his retirement, DEAN was a
Lieutenant assigned to the License Division and was one of the
highest ranking officers in the Division.  In or about November
2014, DEAN became the second-highest ranking member of the
Division and in that role was regularly in charge of the Division
on a day-to-day basis.  He supervised the approximately 40
uniformed police personnel within the Division, and had ultimate
authority to approve or reject licenses and upgrade requests.

b.    ROBERT ESPINEL, the defendant, was a member of the NYPD from 1995 through January 2016, when he retired.   From August 2011 through the time of his retirement, with the exception of approximately five months spent on patrol, ESPINEL was a Police Officer in the License Division.

c.    GAETANO VALASTRO, a/k/a "Guy," the defendant, was a member of the NYPD from 1988 through his retirement in 1999. VALASTRO retired with the rank of Detective, having previously worked at various precincts in Brooklyn, as well as at the Forensic Investigations Division.   Beginning in at least 2003 and continuing through at least 2016, VALASTRO owned and operated Valastro International Tactical Academy ("Valastro Academy"), which was a store in Queens, New York that sold firearms and firearms-related gear and equipment, and provided firearms training courses.

d.    David Villanueva was an NYPD Sergeant who was assigned to the NYPD License Division for more than a decade until April 2016, shortly after which his employment with the NYPD was terminated.   Villanueva, who was involved in the approval or rejection of gun license applications, reported to DEAN until DEAN's retirement.   Villanueva also was the supervising officer who oversaw the Incidents Unit at the License Division. Villanueva has pled guilty to accepting bribes from multiple gun license expediters in exchange for approving and expediting the gun licenses for such expediters' clients.   Villanueva has also pled guilty to lying about accepting bribes from an expediter, not charged herein, when initially questioned by the FBI.   Villanueva pled guilty pursuant to a cooperation agreement with the Government and is cooperating in the hopes of obtaining leniency at sentencing.   Much of the information provided by Villanueva has been corroborated by independent evidence, including documents and information obtained from other witnesses.

e.    Richard Ochetal was an NYPD Officer assigned to the License Division from 2011 through April 2016, shortly after which his employment with the NYPD was terminated.   Ochetal reported to Villanueva, and was assigned to investigate applications and provide first-level approval or rejection of those applications.   Ochetal has pled guilty to accepting bribes from multiple gun license expediters in exchange for approving and expediting the gun licenses for such expediters' clients.   Ochetal pled guilty pursuant to a cooperation agreement with the Government and is cooperating in the hopes of obtaining leniency

8

at sentencing.  Much of the information provided by Ochetal has been corroborated by independent evidence, including documents and information obtained from other witnesses.

          f.  Shaya Lichtenstein was a gun license expediter who frequently interacted with members of the NYPD License Division.  Lichtenstein has pled guilty to bribery and conspiracy to commit bribery in connection with his payment of bribes to, among others, DEAN, Villanueva, and Ochetal.

          g.  Frank Soohoo was a gun license expediter who frequently interacted with members of the NYPD License Division.  Soohoo has pled guilty to conspiracy to commit bribery, bribery, mail fraud, and making false statements in connection with Soohoo's payment of bribes to, among others, DEAN, ESPINEL, Villanueva, and Ochetal.  Soohoo pled guilty pursuant to a cooperation agreement with the Government and is cooperating in the hopes of obtaining leniency at sentencing.  Much of the information provided by Soohoo has been corroborated by independent evidence, including documents and information obtained from other witnesses.

## Overview

      16.  Based on the various sources described herein, I have learned the following:

          a.  From at least 2013 to January 2016, PAUL DEAN and ROBERT ESPINEL, the defendants, along with other police officers assigned to the NYPD License Division, solicited and accepted bribes from gun license expediters in exchange for providing assistance to the expediters' clients in obtaining gun licenses quickly and often with little to no diligence.

          b.  DEAN and ESPINEL, along with Sergeant David Villanueva and Police Officer Richard Ochetal, sought and/or obtained cash, paid vacations, personal jewelry, catered parties, guns, gun paraphernalia and other benefits from multiple expediters, including GAETANO VALASTRO, a/k/a "Guy," the defendant, and Lichtenstein and Soohoo.

          c.  In exchange, DEAN, ESPINEL, Villanueva and Ochetal approved, expedited, and upgraded licenses for clients of VALASTRO, Lichtenstein, and Soohoo.  They did so by foregoing standard License Division diligence, including by failing to interview the applicants and failing to investigate the business-

9

based need for applicants to carry guns.  They approved licenses for individuals with substantial criminal histories, including arrests and convictions for crimes involving weapons or violence, and for individuals with histories of domestic violence.

           d.  DEAN and ESPINEL also took regular and repeated advantage of gun license holders whose applications had been approved.  DEAN regularly sought to approve gun licenses for applicants from whom he believed he could obtain free goods or services.  For example, DEAN and ESPINEL sought and obtained from successful applicants free meals at restaurants, free liquor from a liquor distributor, free beer and soda from a beverage distributor, free car repairs from car shops, and free entertainment, including trips to strip clubs.

           e.  In late 2015, not satisfied with the bribes provided to them by expediters in light of the amounts the expediters were charging their clients, DEAN and ESPINEL decided to retire and go into the expediting business themselves.  In order to ensure the success of their business, DEAN and ESPINEL planned to bribe their former colleagues in the License Division to enable their clients to get special treatment.  They also agreed with VALASTRO, the owner of a gun store, to run their expediting and bribery scheme out of VALASTRO's store.  According to the plan, VALASTRO would benefit from the scheme because DEAN and ESPINEL would steer successful applicants to VALASTRO's store to buy guns.

           f.  To further ensure the success of their corrupt expediting business, DEAN and ESPINEL, while still employed at the NYPD, tried to corner the expediting market by forcing other expediters to work through them.  DEAN and ESPINEL attempted to coerce Soohoo into sharing his expediting clients with them by threatening to use their influence in the License Division to shut down Soohoo's expediting business if Soohoo refused to work with, and make payments to, DEAN and ESPINEL.  They also approached Lichtenstein in an effort to get Lichtenstein to pay them $500 per client in exchange for the use of DEAN and ESPINEL's access to the License Division.

## The License Division Bribery Schemes

### A. Bribery Involving Lichtenstein and Soohoo

17.   Based on my discussions with Villanueva and Ochetal, my review of recordings made by Lichtenstein,[1] and my review of License Division records, I have learned the following:

a.   From at least 2013 through December 2015, Villanueva and Ochetal accepted bribes, including cash payments, from Lichtenstein to approve and expedite gun license applications submitted by Lichtenstein's clients.  In addition, from at least 2014 through December 2015, Villanueva and Ochetal accepted bribes, including cash payments and paid vacations, from Soohoo to approve and expedite gun license applications submitted by Soohoo's clients.

b.   In exchange for the bribes, Villanueva and Ochetal performed perfunctory reviews of applications submitted by Lichtenstein and Soohoo's clients, and routinely approved them within a few weeks' time or less.  They conducted no substantive interview of these clients, and often performed no diligence beyond running an individual's criminal and mental health histories.  Villanueva and Ochetal approved gun license applications for several of Lichtenstein and Soohoo's clients who, in the exercise of typical License Division discretion, would have been rejected.  For example, Villanueva and Ochetal approved applications submitted by individuals with significant arrest histories; previous convictions, including weapons-related misdemeanors and, in at least one instance, a felony conviction; and histories of domestic violence.  They also approved applicants for Limited or Full Carry licenses despite conducting no investigation into the legitimacy of those applicants' business-based need for such licenses, as required by law.

c.   Among the applicants that Villanueva and Ochetal approved at Lichtenstein's request were (i) at least one applicant with a felony conviction for bribery; (ii) an individual

---

[1] Lichtenstein recorded his telephone conversations with various individuals, including members of the NYPD to whom Lichtenstein provided bribes, and used a computer program to e-mail the recorded conversations to himself.  Lichtenstein recorded these conversations prior to learning he was under investigation by law enforcement, and did not make such recordings at the direction of law enforcement.  The FBI obtained these recordings through the execution of a judicially-authorized search warrant on Lichtenstein's e-mail account.

who had been arrested for forgery, had 10 moving violations and three vehicle-related summonses, and at least four domestic violence complaints, including one in which he allegedly threatened to kill someone; and (iii) individuals with arrests and convictions for assault and weapons-related offenses.

        18.   Based on my debriefings of Villanueva and Ochetal, and my discussions with other law enforcement officers who have debriefed Soohoo, as well as my review of documents from the License Division, I have learned the following regarding PAUL DEAN and ROBERT ESPINEL, the defendants, and their connection to Lichtenstein and Soohoo:

        a.   As noted above, DEAN was one of the highest ranking members of the License Division, and beginning in November 2014 was regularly in charge of the License Division.

        b.   Although individuals at Ochetal and Villanueva's level conducted initial and secondary reviews of gun license applications, per License Division protocol, final approval had to be given by the Commanding Officer or a similarly high-ranking officer such as DEAN.   In many instances, DEAN provided the final approval for applications submitted by clients of Lichtenstein and Soohoo.

        c.   After DEAN and ESPINEL learned from Villanueva that Villanueva and Ochetal obtained financial and other benefits from Lichtenstein and Soohoo in connection with the applications, DEAN took advantage of DEAN's status as a high-ranking member of the License Division with the power to approve applications from Lichtenstein and Soohoo's clients in order to seek and obtain benefits from both Lichtenstein and Soohoo in exchange for his approval.

        d.   With respect to Lichtenstein, in 2014, after Lichtenstein began showing up at the License Division wearing a Rolex watch, DEAN repeatedly told Lichtenstein that Lichtenstein should give him Lichtenstein's Rolex because of how much DEAN had done for Lichtenstein.   As Christmas approached, DEAN again asked Lichtenstein for a Rolex.   Ultimately, in consultation with Villanueva, Lichtenstein elected not to buy DEAN a Rolex but to give DEAN $1,000.   Lichtenstein put $1,000 cash in an envelope for DEAN and gave it to Villanueva, to give to DEAN, while Lichtenstein was at the License Division.   Later the same day, Villanueva and DEAN went to DEAN's car in the parking garage of the License Division, and Villanueva handed DEAN the envelope.

12

e.   Soohoo hosted DEAN, ESPINEL, Villanueva, and Lichtenstein regularly at a gun and police gear store that Soohoo owned, where he catered meals and provided alcohol for them.   On other occasions, Soohoo gave expensive bottles of liquor to DEAN and ESPINEL.   DEAN also made demands of Soohoo.   Specifically, in 2015, DEAN and ESPINEL, along with Villanueva and Ochetal, went to two parties at Soohoo's store, at which Soohoo arranged, at DEAN's request, free food and alcohol, and for dancers and prostitutes to attend at Soohoo's expense.

f.   On one occasion in or around November 2015, Soohoo submitted an application on behalf of a client with a significant criminal history ("Applicant-1"), including prior convictions for criminal possession of a weapon and assault with intent to cause injury.   Villanueva told Soohoo that approving Applicant-1 would be difficult, and that, in any event, Applicant-1 would have difficulty purchasing a gun even with a valid license because of the legal requirement that gun sellers conduct background checks on customers.   Villanueva, Soohoo, DEAN, and ESPINEL then discussed Applicant-1 while at Soohoo's gun store. DEAN suggested that if Applicant-1 knew another individual with no criminal history who could apply for a gun license, that other individual could buy a firearm and give it to Applicant-1.   As a result, Applicant-1 would be able to obtain a gun by bypassing the additional controls imposed by background checks, in a manner likely to avoid detection.   Soohoo then submitted license applications for Applicant-1 and Applicant-1's brother, which Villanueva and DEAN then approved.   License Division records show that, ultimately, both Applicant-1 and Applicant-1's brother were able to obtain guns.

## B. Bribery Involving VALASTRO

19.   In addition to accepting bribes from Lichtenstein and Soohoo, PAUL DEAN and ROBERT ESPINEL, the defendants, as well as Ochetal, also accepted bribes from GAETANO VALASTRO, a/k/a "Guy," the defendant.   In particular, VALASTRO provided items of value to DEAN and ESPINEL, and cash and items of value to Ochetal, in exchange for their assistance in expediting and approving gun license applications for VALASTRO's clients, as well as for providing assistance to VALASTRO in other matters before the License Division.   Ochetal assisted VALASTRO in exchange for bribes received directly from VALASTRO, and sometimes also assisted VALASTRO at the request of DEAN and ESPINEL, who separately were also receiving items of value from VALASTRO.

20.  Specifically, based on my conversations with Ochetal, I have learned the following:

a.  Ochetal met GAETANO VALASTRO, a/k/a "Guy," the defendant, through PAUL DEAN and ROBERT ESPINEL, the defendants, at the Valastro Academy, which, as noted above, was a gun store in Queens, New York owned by VALASTRO.

b.  In addition to owning Valastro Academy, VALASTRO also operated as an expediter, and began sending applications to the License Division on behalf of gun license clients in or about 2014.  At various points, DEAN instructed Ochetal to approve the applications of VALASTRO's clients, and Ochetal did so with little or no due diligence.  Moreover, when one of VALASTRO's clients was issued his or her gun license, Ochetal sometimes brought that client's "pink slip" directly to VALASTRO at the Valastro Academy for VALASTRO to provide to his client, thereby increasing the likelihood that the client would purchase a gun at Valastro Academy.  A "pink slip" is the official NYPD form that a license holder obtains from the NYPD authorizing him or her to purchase a gun, and it must be submitted to the gun dealer before the purchase can be consummated.

c.  On occasion, VALASTRO would call Ochetal and ask Ochetal to approve a license or issue a pink slip, and would tell Ochetal that DEAN had signed off on the request.

d.  In exchange for Ochetal's assistance, VALASTRO gave Ochetal three guns, free of charge.  In addition, on one occasion, VALASTRO slipped $500 in cash in Ochetal's bag while Ochetal was at Valastro Academy.

e.  In the spring of 2016, after Ochetal had been approached by law enforcement but before Ochetal had been arrested, Ochetal went to Valastro Academy to pay VALASTRO $2,000 to make it appear as if Ochetal had not received free guns or cash from VALASTRO.  Ochetal provided the money to an employee of Valastro Academy (the "Employee") to give back to VALASTRO.

21.  Based on my debriefing of the Employee and discussions with another law enforcement officer who has debriefed the Employee, I learned the following:

a.  The Employee was employed at Valastro Academy from 2013 through the spring of 2016.

14

b.    PAUL DEAN and ROBERT ESPINEL, the defendants, and Ochetal began spending time at Valastro Academy in or around 2014.   DEAN and ESPINEL usually visited Valastro Academy together.

c.    Ochetal facilitated the expediting and approval of gun license applications for select clients of GAETANO VALASTRO, a/k/a "Guy," the defendant.  VALASTRO charged some of these clients several thousand dollars for his assistance in expediting their applications.  Ochetal also issued pink slips for those clients and sometimes brought the pink slips directly to Valastro Academy.  Other times, the Employee picked up the pink slips from Ochetal at One Police Plaza.

d.    DEAN and ESPINEL assisted VALASTRO in obtaining upgrades to the gun licenses of VALASTRO's clients, such as from Limited Carry to Full Carry or by adding additional days to a client's Limited Carry license.  Once, ESPINEL brought a computer to Valastro Academy and took steps to facilitate an upgrade from inside of the store.

e.    DEAN and ESPINEL also referred license holders with whom they were friendly to Valastro Academy to purchase guns. In those instances, ESPINEL would sometimes have pink slips delivered directly to Valastro Academy, including by Ochetal.

f.    The Employee saw VALASTRO give Ochetal guns on three to four occasions, free of charge.  The Employee also saw VALASTRO give cash to Ochetal on at least one occasion.

g.    The Employee saw VALASTRO give ESPINEL at least one gun, free of charge.  VALASTRO also provided a firearms training course to one of ESPINEL's relatives, free of charge, at ESPINEL's request.  VALASTRO typically charged $1,250 for the training course.  VALASTRO also gave equipment, such as gun holsters, free of charge, to DEAN and ESPINEL, and to the individuals that DEAN and ESPINEL referred to Valastro Academy to receive pink slips and purchase guns.

### DEAN and ESPINEL's Receipt of Additional Benefits From Gun License Applicants

22.    Based on information provided by Ochetal and Villanueva, my review of License Division records, and my discussions with various business owners who obtained gun licenses from the License Division, I believe that PAUL DEAN and ROBERT ESPINEL, the defendants, also regularly sought and obtained goods

and services from License Division applicants and license holders. In particular, DEAN and ESPINEL, in evaluating license applicants, regularly considered the personal benefits they could obtain once those applicants became indebted to DEAN and ESPINEL for their assistance within the License Division.

23.  For example, I am aware of the following regarding a wholesale beverage distributor ("Applicant-2"), and that distributor's son, both of whom were approved for a gun license.

a.  DEAN approved Applicant-2 for a Limited Carry License in May 2014, and upgraded Applicant-2 to a Full Carry License three months later.  Villanueva approved Applicant-2's son for a Limited Carry license in 2014, and upgraded the son to a Full Carry License in 2015.

b.  Beginning after Applicant-2 and Applicant-2's son's initial licenses were approved, DEAN and ESPINEL obtained cases of beer and soda free of charge from the beverage distributorship owned by Applicant-2 and his son.  On one occasion, Villanueva traveled with DEAN and ESPINEL to Applicant-2's beverage distributorship, where Applicant-2 and his son loaded up ESPINEL's trunk with cases of beer.

c.  Villanueva also recalled that, after receiving a license, Applicant-2 was arrested twice for assault-related incidents, including one in which he brandished his gun.  DEAN directed, after the first arrest, that Applicant-2's license not be suspended.  ESPINEL then returned Applicant-2's gun, which had originally been seized by the NYPD, to Applicant-2.

d.  I have reviewed the "Incident" file for Applicant-2's first arrest, and learned that Applicant-2 was arrested for Assault in the 3rd Degree/Menacing on July 18, 2015. The complaining witness alleged that he had engaged in an argument with Applicant-2 at the liquor score, after which Applicant-2 pushed him, kicked him, and then pulled out a black firearm and brandished it at him.  Although the gun that Applicant-2 brandished was originally seized by the NYPD at that time, the License Division did not suspend or revoke Applicant-2's license.

e.  The "Incident" file for Applicant-2's second arrest, which occurred on September 17, 2015, shows that Applicant-2 was arrested for Assault as a Hate Crime, Criminal Mischief in the 3rd Degree, and Menacing in the Second Degree, among other charges.  The complaining victim in that case alleged

that, after he and Applicant-2 engaged in a traffic-related dispute, Applicant-2 attacked the victim's truck with a hammer, smashing its window and shattering glass into the victim's face. License Division records show that, after this second arrest, ESPINEL and DEAN took Applicant-2's guns for safekeeping.  After this second arrest, Applicant-2's license was revoked.

24.  I also have spoken to agents who have debriefed the owner of a bagel store ("Applicant-3") in Manhattan who DEAN assisted in applying for a Limited Carry License in 2011, as well as in later upgrading that license to a Full Carry License. Applicant-3 stated that after the initial application in 2011, and continuing over a period of several years through their retirement in January 2016, DEAN and ESPINEL went regularly to Applicant-3's bagel store, where Applicant-3 gave them free breakfast.

25.  I am also aware that DEAN and ESPINEL obtained free baked goods and other food from the owner of a bakery and other stores in Brooklyn.  The owner ("Applicant-4") had previously been approved for a license.  In addition, Applicant-4 took DEAN, ESPINEL, and other NYPD officials to a strip club in Queens on regular occasions and paid for thousands of dollars' worth of services on their behalf.  I have seen a photograph, provided by Villanueva, of ESPINEL and Applicant-4 outside of the strip club. I have reviewed Applicant-4's application for a gun license, which was submitted in September 2013 and approved one month later by Ochetal and DEAN.  Two months later, DEAN upgraded Applicant-4's Limited Carry license to a Full Carry License.

26.  In addition, I am aware, based on this investigation, of other gun license holders who owned restaurants, an autobody shop, a mechanic shop, a pizzeria, and liquor stores, among other establishments, where DEAN and ESPINEL regularly received free food, goods, or services.

### DEAN and ESPINEL's Post-Retirement Bribery Conspiracy with VALASTRO

27.  Based on my discussions with Villanueva and Ochetal, I have learned the following:

a.  In or about November or December 2015, PAUL DEAN and ROBERT ESPINEL, the defendants, took Villanueva and Ochetal to breakfast.  At the breakfast, DEAN and ESPINEL stated that they would be retiring from the NYPD and starting their own gun license expediting business.

b. DEAN and ESPINEL stated, in substance, that they were tired of expediters like Lichtenstein making money off of DEAN and ESPINEL's work, and that it was DEAN and ESPINEL's time to make money themselves.

c. DEAN and ESPINEL asked Villanueva and Ochetal to be their connection inside the License Division, and told Villanueva and Ochetal that they would pay them a kickback for each application they approved. DEAN and ESPINEL further stated, in substance, that they assumed Villanueva and Ochetal would prefer getting envelopes of money from DEAN and ESPINEL, whom they could trust, rather than from Lichtenstein. DEAN told Villanueva and Ochetal that they would be able to pay off their mortgages with all the money he would pay them. At a later date, when discussing the scheme, DEAN told Villanueva that he should buy his wife a shovel, because they would make so much money that they would have to dig themselves out of it.

d. DEAN and ESPINEL further informed Villanueva and Ochetal, in substance, that they intended to go into business with GAETANO VALASTRO, a/k/a "Guy," the defendant. According to DEAN and ESPINEL, their new expediting business would be based at Valastro Academy. DEAN and ESPINEL explained that, once Villanueva and Ochetal approved an application submitted by one of DEAN and ESPINEL's clients, Villanueva and Ochetal would deliver the client's pink slip directly to DEAN and ESPINEL. DEAN and ESPINEL would then provide the client his or her pink slip at Valastro Academy. As a result, the client would purchase a gun at Valastro Academy, providing a business profit to VALASTRO.

e. DEAN and ESPINEL informed Villanueva and Ochetal that they intended to approach Lichtenstein and Soohoo and demand that Lichtenstein and Soohoo work through DEAN and ESPINEL, such that DEAN and ESPINEL could share in Lichtenstein and Soohoo's profits.

f. DEAN and ESPINEL further told Villanueva and Ochetal that as part of their business plan, they intended to provide a service whereby they would drive their clients into One Police Plaza through the basement of the building, bypassing security, and up to the License Division offices early in the morning, where Villanueva and Ochetal could quickly review and approve their clients' gun license applications.

g. Villanueva and Ochetal verbally assented to DEAN and ESPINEL's bribery proposal. However, they believed that

18

aspects of the proposal, such as DEAN and ESPINEL's plan to bring applicants to the License Division through the basement of One Police Plaza, were too risky and would not work.

h.   In December 2015, DEAN and ESPINEL pulled a box from the trunk of DEAN's car containing files.   They told Villanueva and Ochetal that these were the files and applications of clients that they were already amassing.   At the time, DEAN and ESPINEL were still employed by the NYPD at the License Division.

i.   Also in December 2015, while DEAN and ESPINEL were still employed at the License Division, DEAN and ESPINEL asked Ochetal to travel with ESPINEL to a building in Manhattan, where they picked up a gun license applicant ("Applicant-5") and drove Applicant-5 back to the License Division.   ESPINEL and Ochetal brought Applicant-5 to the License Division offices through the basement parking lot at One Police Plaza, bypassing security.   Once inside the License Division offices, DEAN instructed Ochetal to fingerprint Applicant-5 and process his application.   Ochetal processed the application without conducting an interview of Applicant-5.   Days later, DEAN instructed Ochetal to approve Applicant-5's application, which Ochetal did, notwithstanding that Ochetal had conducted no diligence on the application other than to run Applicant-5's criminal history.

j.   DEAN also told Ochetal, in substance, that they were bringing Applicant-5 to the License Division in order to conduct a dry run of the expediting services that DEAN and ESPINEL intended to provide to their clients.   Ochetal understood that Applicant-5 was one of DEAN and ESPINEL's clients.

28.   I have reviewed the License Division file containing Applicant-5's application.   The file shows that Applicant-5 applied for a Limited Carry License on December 17, 2015 and was approved, less than three weeks later, on January 4, 2016, which I know to be the day before PAUL DEAN and ROBERT ESPINEL, the defendants, officially retired from the NYPD.   (As set forth above, it typically took at least several months for a Limited Carry application to be approved in the ordinary course.) Ochetal signed his approval "per Lt. Dean," and DEAN also signed his approval.   The file contains almost none of the paperwork typically associated with applications for Limited Carry licenses.

29. Based on my discussions with agents who have debriefed Applicant-5, I learned the following:

a.   Applicant-5 is in the real estate business.

b.   A business partner introduced Applicant-5 to PAUL DEAN and ROBERT ESPINEL, the defendants, in December 2015 for the purpose of obtaining DEAN and ESPINEL's assistance in obtaining a gun license for Applicant-5.

c.   DEAN and ESPINEL went to Applicant-5's office, discussed the gun licensing process with Applicant-5, and assisted Applicant-5 in filling out his application for a gun license. Applicant-5 understood, from his conversations with DEAN and ESPINEL, that both were either retired from the NYPD or about to retire from the NYPD.

d.   Based on his discussions with DEAN and ESPINEL, Applicant-5 understood that he would have to pay an expediting fee to DEAN and ESPINEL, although they did not discuss a precise amount in advance.  Applicant-5 believed he would have to pay between $500 and $1,000.

e.   Within days of coming to Applicant-5's office, ESPINEL and another male (who, based on Ochetal's statements, I believe to be Ochetal) picked up Applicant-5 and drove him to the basement of One Police Plaza, from where they went to the License Division offices.  Applicant-5 submitted his application and was fingerprinted, but not interviewed or subjected to any other process.  Applicant-5 remained in the License Division for less than one hour.

30.   Based on my discussions with the Employee of Valastro Acadamy and my discussions with other agents who have debriefed the Employee about, among other things, plans by PAUL DEAN and ROBERT ESPINEL, the defendants, to enter into the expediting business, I have learned the following:

a.   Toward the end of 2015, DEAN and ESPINEL came to Valastro Academy and had a conversation with GAETANO VALASTRO, a/k/a "Guy," the defendant.  The Employee was not part of the conversation but was in a location inside the otherwise empty store where the Employee could hear the conversation.

b.   In the conversation, DEAN and ESPINAL told VALASTRO that they were retiring and going into the expediting business.  ESPINEL referred to the money being charged to clients by "Jewish" gun license expediters, and further told VALASTRO that such expediters should not be making "all the money while we're

20

busting our asses." I believe that, in referring to "Jewish" expediters, ESPINEL and DEAN were referring to, at a minimum, Lichtenstein.

            c.   DEAN and ESPINEL told VALASTRO that they wanted to go into business with him, and specifically to use the Valastro Academy as their business premises. DEAN and ESPINEL explained that VALASTRO would benefit by continuing to see an increase in customers for both gun purchases and firearms training courses through DEAN and ESPINEL, who would retain their ability to deliver licenses and pink slips directly to Valastro Academy. DEAN and ESPINEL also referred to their ability to pay members of the License Division for assistance with DEAN and ESPINEL'S clients.

            d.   VALASTRO agreed to go into business with DEAN and ESPINEL.

            e.   Toward the end of the conversation, ESPINEL asked the Employee to join DEAN, ESPINEL, and VALASTRO. Both ESPINEL and VALASTRO told the Employee, in substance, that the Employee should not repeat anything from the conversation to anyone, and that it "went with [the Employee] to your grave."

            f.   Later, VALASTRO, whose business had been struggling and who had been unable to pay the Employee the entirety of the Employee's salary, told the Employee that the arrangement with DEAN and ESPINEL would be financially significant for Valastro Academy and that VALASTRO would be able to pay the Employee what was owed to the Employee.

            g.   Days later, ESPINEL returned to Valastro Academy and spoke with VALASTRO, in the Employee's presence. ESPINEL said, in substance, that Ochetal did not want to go along with ESPINEL and DEAN's bribery scheme, but that ESPINEL and DEAN had another contact inside the License Division who would help them.

            h.   After DEAN and ESPINEL retired in early 2016, they began to use VALASTRO's office at Valastro Academy in connection with their business. However, within a short time period, after Lichtenstein was arrested (as described below, in April 2016), DEAN and ESPINEL largely stopped doing any business with VALASTRO.

                    i.    Shortly after Lichtenstein's arrest, DEAN,
ESPINEL, and VALASTRO met at Valastro Academy to discuss the
arrest, in the Employee's presence.  DEAN and ESPINEL said to
VALASTRO, in substance, that corruption at the License Division
was being exposed "because [Ochetal] didn't do what we asked him
to do," with which VALASTRO agreed.  I believe this to be a
reference to DEAN and ESPINEL's previous offer to pay Villanueva
and Ochetal to expedite the licenses of DEAN and ESPINEL's
clients, which, as set forth below, Villanueva and Ochetal
ultimately did not agree to do.

                    j.    The Employee confirmed, as discussed above in
paragraph 20, that around the time that Lichtenstein was arrested,
Ochetal came to Valastro Academy and handed the Employee a stack
of cash to be given to VALASTRO.  The Employee recalled that
Ochetal commented, in substance "they're on to me."

                    **DEAN and ESPINEL's Attempted Extortion of**
                         **Lichtenstein and Soohoo**

          31.    As noted above, in November or December 2015, PAUL
DEAN and ROBERT ESPINEL, the defendants, told Villanueva and
Ochetal that they intended to demand that Lichtenstein and Soohoo
consolidate their expediting businesses with DEAN and ESPINEL.

          32.    I have debriefed Villanueva and spoken to other law
enforcement officers who have debriefed Soohoo, both of whom, as
noted above, are cooperating with the Government.  Based on those
debriefings, I learned the following with respect to PAUL DEAN and
ROBERT ESPINEL, the defendants, and their plan to extort other
expediters:

                    a.    In or about November or December 2015, DEAN,
ESPINEL, and Villanueva went to Soohoo's gun store in Queens
unannounced.

                    b.    When they arrived, DEAN went behind the
counter where Soohoo was working and told Soohoo that he and
ESPINEL would be retiring and going into the expediting business.

                    c.    DEAN further told Soohoo that he and ESPINEL
were visiting other licensing consulting businesses with the
intention of consolidating all of them within DEAN and ESPINEL's
new business.  DEAN stated, in substance, that whomever did not
agree to work for DEAN and ESPINEL would be put out of business.

                                 22

d. DEAN demanded that Soohoo pay him $500 per applicant for all of Soohoo's clients. DEAN further stated that he could get Soohoo banned from One Police Plaza and ensure that no License Division personnel would deal with Soohoo, thereby ruining his expediting business. As noted above, at this time, DEAN and ESPINEL were still employed by the NYPD.

e. As DEAN was speaking with Soohoo, ESPINEL took a gun belt from a shelf or rack in Soohoo's store, tried it on, and kept it without paying for it. ESPINEL also took other paraphernalia from the store without paying for it.

f. Soohoo took seriously DEAN and ESPINEL's threats because Soohoo believed that DEAN and ESPINEL had the ability to use their influence and power within the License Division to ruin Soohoo's expediting business. Ultimately, however, Soohoo ceased expediting gun license applications soon after DEAN and ESPINEL retired because, as described below, Villanueva was no longer able to assist him in exchange for bribes.

33. On or about December 8, 2016, PAUL DEAN and ROBERT ESPINEL, the defendants, and Villanueva traveled to Lichtenstein's home to meet Lichtenstein. According to Villanueva, the purpose of the meeting was for DEAN and ESPINEL to insist that Lichtenstein refer business to DEAN and ESPINEL. The FBI has obtained a recording of that meeting. Based on my discussion with an agent who has reviewed that recording, I learned the following:

a. After DEAN, ESPINEL, and Villanueva arrived, DEAN told Lichtenstein "It's time for us to retire . . . We're gonna retire and open our own consulting firm." DEAN further said that "[y]ou know the experience that I have . . . and you know the capabilities that I have. There are several dozen consultants . . . out there. None of them have the knowledge and experience that I have, and Bobby [ESPINEL]." DEAN told Lichtenstein that he and ESPINEL were opening up an office at Valastro Academy.

b. DEAN later told Lichtenstein that "[y]ou probably have a laundry list of people who need licenses" and that "I just want a little bit . . . we'll do all the work for you." DEAN later specified that he wanted $500 for each client that he assisted Lichtenstein with obtaining or expediting a license.

c. ESPINEL told Lichtenstein that he and DEAN would "go to your clients . . . We take them to One Police Plaza,

they're in and out within fifteen to twenty minutes, we drive them back to their office or residence."

d.   Lichtenstein responded by asking if he could "speak freely" and went on to say that "people are looking at us. People are jealous of what I do.  I don't think it's a good idea, for now, to start shooting out licenses."  Rather, Lichtenstein said, he was more concerned with obtaining approval for several clients whose applications were in the "pipeline" who he wanted to be approved.  DEAN reminded Lichtenstein that it was DEAN who signed off on Lichtenstein's clients' applications.  DEAN and EPSINEL further indicated, in substance, that they would not be retiring right away and could start doing business with Lichtenstein in a few months.

e.   DEAN said that "I'm done watching people make money off of my back.  I'm the one whose signing off on everything, I'm the one who's taking care of everything. . . you're making money you, and dozens of other people."  DEAN later said that "[t]he light clicked on about six months ago, when I'm sitting there and watching everybody get cash hand over fist, as I'm signing off on this stuff."  ESPINEL added, "two thousand, five thousand, ten thousand."

f.   The meeting ended without a specific commitment from Lichtenstein, although Lichtenstein promised to continue to discuss the proposal with DEAN and ESPINEL.

34.   Based on my discussions with Villanueva, Ochetal, and other personnel within the License Division, I have learned the following:

a.   In late December 2015, rumors began circulating within the License Division that Lichtenstein was now charging his clients as much as $18,000 per application, which License Division personnel thought would bring suspicion on the License Division.

b.   Given the rumors regarding Lichtenstein, as well as what he perceived as the riskiness of the plan proposed by PAUL DEAN and ROBERT ESPINEL, the defendants, Villanueva decided, in consultation with Ochetal as well as the Commanding Officer of the License Division, to stop working with Lichtenstein and Soohoo, and to not assist DEAN and ESPINEL with their expediting business.

c.    Shortly after DEAN retired in January 2016, DEAN called Villanueva and cursed at him for refusing to expedite DEAN's clients' applications in exchange for bribes.

35.    As previously described, Lichtenstein was arrested and charged in this District with committing bribery and conspiracy to commit bribery on or about April 18, 2016, and he subsequently pled guilty to the charges.  Villanueva was arrested and charged in this District with committing bribery and conspiring to commit bribery on or about June 20, 2016, and, as described above, has pled guilty pursuant to a cooperation agreement.  Ochetal and Soohoo also have pled guilty in this District to, among other charges, conspiracy to commit bribery.

### VALASTRO's False Statements to the Government

36.    On or about October 20, 2016, GAETANO VALASTRO, a/k/a "Guy," the defendant, met with the Government.  An attorney for VALASTRO accompanied him to the meeting, which occurred with myself, other FBI agents, a Sergeant from the NYPD's Internal Affairs Bureau, and two prosecutors from the U.S. Attorney's Office.  At the meeting, and in response to questions from the prosecutors, VALASTRO made the following false statements:

a.    He stated that he did not know defendants PAUL DEAN and ROBERT ESPINEL well, and also did not know Ochetal well, when in truth and in fact he had spent considerable time with each of them.

b.    He stated that he had never provided any money or gifts to DEAN, ESPINEL, or Ochetal, when in truth and in fact he had provided cash to Ochetal, and non-cash gifts and benefits to DEAN and ESPINEL.

c.    He acknowledged agreeing to permit DEAN and ESPINEL to use his business address in connection with the expediting business they intended to begin after retiring from the NYPD.  He stated, however, that he had nothing to do with DEAN and ESPINEL's business and knew nothing of any efforts by DEAN or ESPINEL to bribe any NYPD personnel inside the License Division in connection with gun license applications submitted by their clients, when in truth and in fact he was aware of DEAN and ESPINEL's plan to bribe the License Division, agreed to it, and stood to benefit from it.

## NYPD's Receipt of Federal Funding

37.   Based on my training, experience, and review of publicly available information, I know that the NYPD receives in excess of $10,000 annually in federal funding.

WHEREFORE, the deponent prays that arrest warrants be issued for PAUL DEAN, ROBERT ESPINEL, and GAETANO VALASTRO, a/k/a "Guy," the defendants, and that they be imprisoned or bailed, as the case may be.

JOSEPH DOWNS
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
24th day of April, 2017

THE HONORABLE KEVIN N. FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK