**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
United States of America

                                                                17 Cr. 398 (ER)

                                      Plaintiff,

                -against-

Paul Dean, et. al.,

                                      Defendants.
------------------------------------------------------------------------X

## SENTENCING MEMORANDUM ON BEHALF OF PAUL DEAN

                                                        LAW OFFICES OF ABE GEORGE, P.C.
                                                        _____/s/_____
                                                       By: Abe George, Esq.
                                                     44 Wall Street, 2nd Floor
                                                     New York, NY 10005
                                                     (P) 212-498-9803
                                                     (F) 646-558-7533
                                                     E-mail: abe@abegeorge.lawyer

Dated: January 23, 2019

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................... 1

I. APPLICABLE LEGAL STANDARDS ................................................................. 2

II. NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY
OF AND CHARACTERISTICS OF THE DEFENDANT ....................................... 3

    A. Nature and Circumstances of the Offense ................................................... 3

        1. Background of Dean's Arrest ............................................................. 3
        2. Dean's Charges & Plea ....................................................................... 3
        3. Dean was Not the Mastermind Behind the Corruption
           at the Licensing Division ................................................................... 4
        4. Although Dean Agreed to the Post-Retirement Conspiracy
           He Never Consummated His Plan ...................................................... 6

    B. Paul's Personal History and Characteristics ............................................... 6

III. A NON-JAIL SENTENCE IS APPROPRIATE PURSUANT TO § 3553(a)(2) ............... 9

    A. Paul Dean Should Be Given a Non-Jail Sentence Because It Would Promote
Respect for the Law In That Other Police Officers Would See a Benefit to Breaking the
"Blue Wall of Silence." ............................................................................ 10
    B. A Non-Jail Sentence Will Adequately Reflect the Seriousness of the Offense and
Provide Just Punishment ......................................................................... 14
    C. Paul's Felony Plea is Sufficient to Afford Adequate Deterrence to
Criminal Conduct.. ................................................................................. 15
    D. The Intense Publicity Surrounding Dean's Case and His Status as a Former Cop
Weigh Heavily against Imprisonment. .................................................. 15

    E. A Custodial Sentence is Unnecessary to Keep Dean from Reoffending ........... 16

IV. THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES ................ 16

V. CONCLUSION ................................................................................................. 17

# **PRELIMINARY STATEMENT**

I respectfully submit this memorandum on behalf of Paul Dean in connection with his sentencing proceeding scheduled for January 31, 2019. On August 15, 2018, this Court accepted Mr. Dean's plea of guilty to the second count of Indictment 17 Cr. 398, charging him with conspiring to pay bribes and gratuities, in violation of Title 18, United States Code, Section 371. Mr. Dean's stipulated offense level of 15 carries a sentencing range of 18 to 24 months imprisonment and the applicable fine range that the Court may set is $7,500 to $750,000. We implore this Court to grant Mr. Dean, a 22-year veteran of the NYPD, a time served or non-jail sentence without a fine or alternatively a minimum fine.

There are numerous reasons for the court to consider a non-jail sentence for Mr. Dean under 18 U.S.C. § 3553(a) including: 1) Mr. Dean's lack of any criminal contacts prior to his arrest; 2) Mr. Dean's unblemished 22 year NYPD record prior to this incident, being a first responding officer on 9/11, and receiving commendations while serving as a police officer; 3) the stain of a felony conviction that Mr. Dean has had to explain to his family, friends and children, which will live on in search engines and Internet history forever; 4) the foreclosure of post-retirement jobs involving security with his felony conviction and loss of Mr. Dean's service weapon; 5) Mr. Dean never consummated the post-retirement conspiracy to bribe other officers although he agreed to the plan and committed an overt act; 6) Corruption and bribery appeared to be sanctioned in the licensing division by Mr. Dean's commanding officer Mike Endall and others; 7) the potential risk of harm of being a police officer in jail; 8) Mr. Dean's family commitments caring for his three children including being the primary care taker to his 5 year-old child; 9) Mr. Dean's willingness to quickly plead guilty and own up to his actions; and lastly 10) Mr. Dean's willingness to break the "Blue Wall of Silence" and provide truthful information on three separate occasions to the government with information regarding Mr. Dean's fellow officers including his commanding officer Mike Endall;

1

## I. APPLICABLE LEGAL STANDARDS

Section § 3553(a) provides that the sentence be "sufficient, but not greater than necessary to comply with the specific purposes set forth at 18 U.S.C. § 3553(a)(2)." *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010) (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*); *see also United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). Those purposes are: (1) the nature of the offense and the history and characteristics of the defendant; (2) the purposes of sentencing, described in § 3553(a)(2) to include (a) the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (b) the need to afford adequate deterrence to criminal conduct; (c) the need to protect the public from future criminal conduct by the defendant; and (d) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the Guidelines and their policy statements; (5) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (6) the need to provide restitution. 18 U.S.C. § 3553(a).

Concerning the Guidelines, post-*United States v. Booker*, 543 U.S. 220 (2005), it is "emphatically clear that the Guidelines are guidelines – that is, they are truly advisory." *Dorvee*, 616 F.3d at 183 (quoting *Cavera*, 550 F.3d at 189) (*en banc*). Although the Guidelines are to be given "fair consideration" "before imposing" a sentence, "in the end, [the Court] must make an 'individualized assessment' of the sentence warranted by § 3553(a) 'based on the facts presented.'" *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (citations omitted); *see also Pepper v. United States*, 562 U.S. 476, 487 (2011) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (internal quotations and citations omitted). Regarding

this individualized assessment, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original). Indeed, the Court "may vary [from the Guidelines range] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quotations and citations omitted); *Gall v. United States*, 552 U.S. 38, 47 (2007) (court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range").

## II   NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY OF AND CHARACTERISTICS OF THE DEFENDANT

### A.   Nature and Circumstances of the Offense

#### 1.   Background of Dean's Arrest

One of the most important factors to consider in sentencing Mr. Dean is the nature of the crime that he committed and Mr. Dean's limited role in the overarching government investigation into police corruption. With Mr. Dean being the highest-ranking officer in the NYPD gun license division to be indicted it would be easy to blame Mr. Dean for the widespread corruption in the licensing division, but that would be a myopic view of the facts to date.

According to published reports, former Police Commissioner Bratton stated that the police corruption investigation started back in 2013 by the Internal Affairs Department and was then quickly joined by the FBI. The initial federal probe centered around two civilians Jeremy Reichberg and Jona Rechnitz, who both served on Mayor De Blasio's inaugural committee and either donated or raised money for him. Reichberg and Rechnitz were not quiet about their influence with the Mayor or the NYPD. The arrests of Reichberg and Rechnitz in 2016 started a chain reaction within the NYPD of transfers, early retirements and arrests of police officers.

#### 2.   Dean's Charges & Plea

Mr. Dean was arrested in April of 2017, along with his former partner Officer Robert Espinel and

a licensed gun dealer named Guy Valastro. Mr. Dean's arrest stemmed from the prior arrests of Officers Richard Ochetel, Sgt. David Villanueva (who were both from the licensing division of the NYPD) and separately apprehended civilian Alex "Shaya" Lichenstein, who was a confederate of Reichberg and Rechnitz. It was alleged in the Lichenstein/Villanueva indictment that Lichenstein was bribing members of the licensing division to help expedite over 150 applications for gun licenses for which he was being paid upwards of $18,000 per license.

In his indictment Mr. Dean was charged with various crimes including: 1) a scheme to accept bribes from Gaetano Valastro from 2014 through 2015, in exchange for official action by Dean in his capacity as a New York City Police Department ("NYPD") lieutenant, as charged in Count One of the Indictment; 2) conspiracy to pay bribes and gratuities from November 2015 to January 2016, post Mr. Dean's retirement to officers of the licensing division to help expedite gun licenses in a private expediting business Mr. Dean had set up, as charged in Count Two of the Indictment; and (3) a conspiracy to commit extortion under color of official right in or about December 2015, as charged in Count Three of the Indictment.

On August 15, 2018, this Court accepted Mr. Dean's plea of guilty to the second count of Indictment 17 Cr. 398, charging him with the post-retirement conspiracy to pay bribes and gratuities, in violation of Title 18, United States Code, Section 371. In his allocution Paul stated:

> From in or about November 2015 through in or about January of 2016, I planned to retire from the New York City Police Department licensing division to go into a gun license expediting business. I, along with another, agreed to pay cash bribes to Richard Ochetel and David Villanueva of the NYPD licensing division, whom I believed were being bribed already, to secure those officers' help in approving and expediting gun license applications.
>
> In furtherance of the conspiracy, I, along with another person, met with Richard Ochetel and David Villanueva at a diner in Manhattan in December of 2015 to discuss paying them future bribes to help us expedite gun licenses for our customers.

*See Exhibit A:* Transcript of Plea Hearing dated August 15, 2018, ("Plea Hearing Tr.") at 16-17.

### 3. Paul Dean was Not the Mastermind Behind the Corruption at the Licensing Division

Mr. Dean was the first of his co-defendants charged in the indictment to plead guilty and in so

4

doing Mr. Dean quickly owned up to his role in the corruption that was occurring in the NYPD licensing division. However, despite the media rhetoric, and Paul's high-ranking role, Paul was never the mastermind behind the bribery and corruption schemes in the licensing division, in fact these schemes pre-dated Paul's role as second in command at the licensing division.

Paul was a member of the NYPD from 1994 through January of 2016 and became assigned to the licensing division in 2008. It was only in 2014 that Paul became second in command at the licensing division. **See Indictment**, USA vs Dean, et. al., 17 Cr. 398 (ER) ¶15(a). According to Mr. Dean's own indictment Paul learned about the bribery scheme from Officer Richard Ochetel and Sgt. David Villanueva first:

> After DEAN and ESPINEL learned from Villanueva that Villanueva and Ochetal obtained financial and other from Lichtenstein and Soohoo in connection with the applications, DEAN took advantage of DEAN'S status as a. high-ranking member of the License Division with the power to approve applications from Lichtenstein and Soohoo's clients in order to seek and obtain benefits from both Lichtenstein and Soohoo in exchange for his approval.

**See Indictment**, USA vs Dean, et. al., 17 Cr. 398 (ER) ¶18(c). Paul's allocution specifically referenced that "he agreed to pay cash bribes to Richard Ochetel and David Villanueva of the NYPD licensing division, whom I believed were being bribed already," thus clearly on all accounts Paul was acquiescing into a corrupt system rather than starting it himself.

As will be discussed infra, corruption was always occurring within the licensing division. It was an open secret that gun licenses would be given to people connected to higher-ups in the police department which is why the commanding officer of the licensing division was always carefully selected. Although against written internal policy, receiving gifts such as alcohol, meals, jewelry, and tickets for performing police functions (e.g. granting gun licenses) were never really looked at as criminal, as opposed to receiving cash—whom most would agree was a clear crime. Getting a gift or service from a licensee was part of the culture of the licensing division. Not only did commanding officer Endall approve this quid pro quo system but Police Commissioners Kelly and Bratton seemed to tacitly approve this system.

5

Although lower in rank, Sgt. David Villanueva and Richard Ochetel were bigger players in the corruption scheme than Dean. As articulated in the indictment against Paul, most of the allegations of corruption with Paul involve his acceptance of gifts and services. The only money Dean ever took was $1,000 cash, given to Dean by Villanueva. Obviously, Paul realized that even the taking of gifts/services was wrong but Mr. Dean did not profit as much as Villanueva and Ochetel who flaunted new cars and regularly went on extravagant vacations with their ill-gotten gains. A quick look at Paul's financials in the PSR report demonstrate that Mr. Dean never got rich off this scheme, owing money on credit cards and a home equity line on his modest home.

The motivation for Paul's crime was simple – he was tired of watching his fellow officers, expeditors like Alex "Shaya" Lichenstein, and attorneys like John Chambers, make thousands of dollars for "processing" gun licenses while it was Mr. Dean who was doing all of the work to keep his fellow officers get rich scheme afloat. Mr. Dean surmised that if Lichenstein and other gun dealers with no knowledge of the licensing process could set up an expediting business and receive favorable treatment from NYPD officers in exchange for "gifts" then he could do the same. In fact, it was Sgt. Villanueva who first suggested such an arrangement.

Clearly, this error in judgment would change Paul's life forever. In his letter to the Court, Paul states "I would like to apologize to the men and women of the New York City Police Department. My actions have done nothing but damage the hard work these police officers do every day. I failed at holding myself to the higher standard all police officers should be held to." **See Exhibit B**: Letter by Paul Dean.

4. **Although Dean Agreed to the Post-Retirement Conspiracy He Never Consummated His Plan**

Paul's scheme never got off the ground. In Paul's mind it was one thing to give or take a gift or service but another thing to actually pay cash to an officer for an official function and Paul could not go

6

forward with the agreement that he previously proposed in the Manhattan diner in late 2015. On or about January of 2016, on Dean's prodding, Dean's partner Robert Espinel called Endall to warn him about the cash payments that Villanueva and Ochetel were receiving for gun licenses. Dean and Espinel knew that Endall was ok with members of the division including himself receiving gifts but Dean and Espinel weren't sure if Endall knew the extent to which Villanueva and Ochetel were receiving cash payments. In their phone call, Endall assured Espinel that he had fixed most of the issues in the division. **See Exhibit C:** Call Log Corroborating Espinel's call to Endall's cell phone in January of 2016.

After Espinel's January call Dean continued to hear about gun holders getting licenses when they weren't supposed to which prompted Dean to visit Endall's house in March of 2016 to try to get Endall to stop the ongoing corruption. Dean's story is corroborated by recently obtained internal charges by the New York City Police Department which prove that Mike Endall was found guilty in an administrative proceeding of being "notified by another member of the service of allegations of criminal misconduct related to firearm licenses and failed to make required reports or notifications or conduct and investigation." **See Exhibit D:** Specification Charge Sheet for Mike Endall. Rather than arrest Mike Endall and hold him accountable for the corrupt system that he oversaw, the NYPD let powerful Deputy Inspector retire quietly. Dean states that Endall had kept a book of high-ranking police officials that he had done "favors" for and had always publicly said "that if I am going down, a whole lot of other people are coming with me."

### B. Paul's Personal History and Characteristics

Mr. Paul Christian Dean is 46 years old, and a resident of Wantagh, NY. Paul is the loving father of two daughters who are 21 and 17, who are living in Salt Lake City, Utah with Paul's ex-wife. His daughters maintain contact with Paul on daily basis, visiting him during the summer. Paul

also has a younger 5-year-old son from a recent relationship and serves as the primary care giver for the child.

Prior to this incident, Dean had a stellar career with the NYPD starting post-college at the age of 21 in 1994 and retiring at 45 years old in 2016. During the course of his career Paul went from police officer, to the rank of Sergeant in 2001 and finally Lieutenant in 2006. Paul made over 166 arrests and was awarded 7 medals for excellent police duty in his 22 years on the job. **See Exhibit P**: Relevant Dean NYPD Records.

Paul wanted to be an NYPD officer at the behest of his mother. Paul's parents, now deceased, were both social workers serving the City of New York and Paul wanted to follow suit in public service. Paul's sister Lauren Oak stated "When Paul was accepted into the NYPD he was the happiest I had ever seen him. It was like a missing piece of the puzzle had suddenly been found and it was a perfect fit." **See Exhibit E**: Letter in Support by Lauren Oak.

As the Court is aware, by the nature of divorce, many men cannot rely on their ex-wives for any type of positive feedback, but this is certainly not true of Paul's ex-wife Martha Boutsikakis-Gamble, which speaks to the character of Mr. Dean. Martha met Paul or Chris (short for his middle name Christian), as she calls him, when Paul was just out of the Academy, and she has known Paul for over 24 years. Martha reported that "Chris ALWAYS identified first and foremast as a NYPD officer, then a father husband, son and friend." **See Exhibit F**: Letter in Support by Martha Boutsikakis-Gamble

According to Martha, a week prior to 9/11, Paul's second daughter was born, and after the Twin Towers were destroyed Chris was one of the first people at the crash site. She stated Paul was on site for three months and was "dedicated to sifting through the rubble and helping out his fellow man in whatever way possible." **See Exhibit F**: Letter in Support by Martha Boutsikakis Gamble.

Martha stated that 911 changed Paul and he never got the help that he needed. **See Exhibit F**. Martha stated "Our Marriage was sacrificed for the benefit of the NYPD," Paul was more dedicated to his job as a police officer rather than his marriage which is why they got divorced. **See Exhibit F**.

Mr. Dean became involved with another woman named Tara McDevitt from 2010 until July of 2018. Tara has a 10-year-old daughter of her own and had a child with Paul who is now 5 years old. Tara reports that because of her busy schedule as an attorney Paul was taking care of both her daughter and their son when they were together. Paul had a second chance at giving Tara's daughter and his own son the relationship that his daughters never had because of his dedication to the NYPD. **See Exhibit B**: Letter by Paul Dean. Tara was engaged and living with Paul until July of 2018 when the strain of the case became too much for their relationship to bear. Tara states:

> My son is living what many little boys could probably only dream about – getting to hang out with his dad every single day. They have become best friends – they are always going to the park, zoo, aquarium, baseball games, to see trains which his favorite thing are, and even taking day trips during breaks and holidays. If he was to lose his dad, even for a short amount of time, I do not think devastated even describes how he would feel. I honestly do not even know how I would explain to him why he could not see his dad every day.

**See Exhibit G**: Letter in Support by Tara McDevitt.

The impact of this case has been tremendous for Paul. Paul states *"having been convicted of a felony in connection with my service I destroyed my reputation and tarnished the reputation of the New York City Police Department. An extreme lack of judgment and moral weakness has led me to this point in my life, which is why I took responsibility for my actions and pled guilty."* **See Exhibit B**: Letter by Paul Dean. Paul further states "It will be hard for me to even think of obtaining retirement employment with the stains of this criminal conviction on my record." **See Exhibit B**: Letter by Paul Dean

Paul's biggest fear is missing out on the lives of his children if sentenced to jail. Paul states "Being a father who has a positive influence on him (referring to Dean's 5-year-old child) and is

involved in raising him fulltime is one of the most important job responsibilities I have ever had. It is with heavy heart that my actions have jeopardized all three of my children's well-being." **See Exhibit B**: Letter by Paul Dean.

Paul's fears of the impact of his separation from his 5-year-old son are shared by numerous members of Paul's family who have all seen the strong connection his son has to Paul **See Exhibit H:** Letter in Support by Barbara Blake-Galeazzi; **See Exhibit I:** Letter in Support by Daniel Oak; and **See Exhibit J:** Letter in Support by Christopher Blake

Paul's daughters Katherine and KD (17-year-old minor) express the same concern regarding their father's absence in their lives. Paul's youngest daughter KD who is in her final year of high school stated she "wants her dad around for graduation and looking at college campuses." **Exhibit K:** Letter in Support by KD. Paul's oldest daughter Katherine stated "I would be lost and struggling without him (Dean)," and she further states "my father has been a pillar of support for me, my younger sister and my younger brother." **Exhibit L:** Letter in Support by Katherine Dean. Katherine states "Leniency on my father's sentence would be the removal of a crushing weight on not only my shoulders, but it would remove the debilitating strain that has been put over my family with this felony conviction and give us a start in finding our new normal." **Exhibit L:** Letter in Support by Katherine Dean.

### III. A NON-JAIL SENTENCE IS APPROPRIATE PURSUANT TO § 3553(a)(2)

**A. Paul Dean Should Be Given a Non-Jail Sentence Because It Would Promote Respect for the Law In That Other Police Officers Would See a Benefit to Breaking the "Blue Wall of Silence."**

In the 1970 *Knapp Commission* hearings on police corruption Police Officer Frank Serpico testified about corruption involving his fellow officers and shed light on a longstanding obstacle to investigating corruption, "the Blue Wall of Silence," under which officers regard testimony against a

fellow officer as betrayal. As will be described more further infra, Paul gave a substantial amount of information but was never offered a "5K" mitigation letter, and in fact wound up receiving the same plea offer as co-defendant Espinel, who did not proffer with the government. If this Court were to downwardly depart from the sentencing guidelines and impose a non-jail sentence this would promote respect for the law and encourage future officers to come forward. This is one of those rare cases that exacting a jail sentence on a defendant like Paul could create a chilling effect on future officers caught up on the wrong side of the law because they might not perceive any benefit in cooperating the way Mr. Dean did, thus strengthening the "Blue Wall."

After Paul Dean's arrest in 2017 Paul willingly had three proffer sessions with the Government. During those sessions Paul provided a unique glimpse into the systematic culture of corruption that pervaded the license division. According to Paul, when he was recruited to the licensing Division in 2008 by the former Commanding Officer, Deputy Inspector ("D.I.") Andrew Lunetta, he was informed by Lunetta that the licensing division existed to "take care of retirees, donors to the NYPD, and individuals in high power positions." No one saw anything wrong with accepting gifts and services for expediting gun licensees.

From 2008 through 2014 Deputy Inspector Mike Endall was the 2nd in Command at the licensing division and was placed there as a point of contact for anyone needing help to get gun licenses, particularly those people connected with the police unions, the Police Athletic League or the NYC Police Foundation. In August of 2014, D.I. Andrew Lunetta retired making D.I. Endall the new commanding officer of the licensing division. Shortly after his temporary appointment, Endall informed Dean that he had a meeting with Commissioner Bratton and John Miller who informed Endall they wanted to keep Endall there to continue the current "favor" system to retirees and donors. Endall recruited Paul to serve as his number two and take over all the administrative tasks of the licensing division although Paul did not hold the

proper rank for the position. Endall knew that Dean would not disrupt the current system and Endall specifically told Dean to approve any applications that Sgt. Villanueva gave him. As Paul's ex-fiancée said, Paul had a tough time saying "no" to people and blindly accepted the position and maintained the unit's status quo, rather than reporting the rampant corruption. **See Exhibit G:** Affidavit of Tara McDevitt.

During the three-proffer sessions Paul told the government about the following information that he had direct first-hand knowledge about including:

- a) Deputy Inspector Michael Endall allowed Donald Trump Sr., Attorney Michael Cohen, Donald Trump Jr, to obtain full carry gun licenses even though the proper credentials were not in the file because of their generous donations to the Police Athletic League or the NYC Police Foundation.

- b) Dean inspected the gun license application files of other Police Athletic League and NYC Police Foundation trustees/donors and found that the following licensee's files did not meet the qualifications for having a gun licenses, but were approved by Endall anyway: John Catsimatidis (Red Apple Group), Thomas Mottola (Former Sony CEO), John Mack (Morgan Stanley CEO) Ronald Lauder (Este Lauder Corp), Roger Ailes (Fox News Corporation), Sean Hannity (Fox News Corporation).

- c) Endall asked Dean to push through actor Tracy Morgan's gun license as a favor to attorney John Chambers (indicted and convicted in a separate indictment) even though Morgan had a prior felony conviction.

d) Dean reported that under Endall many members of the cast of "Blue Bloods" including Tom Selleck, who did not have the required residency needed for a gun license, had inadequate documentation to justify the issuance of a gun license.

e) Dean reported that Endall had approved a gun permit for Richard Gans (owner of Metropolitan Lumber & Hardware, Scores and Penthouse Executive Club) because members of the police department including Chief Spinella, were getting free lap dances at the club.

f) In 2013, Endall was directed by Police Commissioner Kelly to issue the Prince of Jordan a full carry gun license. Kelly wanted this done so the NYPD Detective stationed in Jordan could carry a gun. Endall ordered Dean to issue the license and in return the Prince gave Dean a silver bullion coin which was turned over to the U.S Attorney's Office.

g) Dean delivered a gun license to a jeweler on Canal Street because Endall had told Dean that the jeweler had gotten him a Rolex watch. Dean also produced pictures of Endall wearing that watch to the government.

h) Dean reported that Endall gave back Arthur Mondella's ("Cherry King") gun license to him after an arrest where his license should have been permanently removed, which is the same gun that Mondella used to shoot himself in an unrelated police raid on his plant.

i) Between 2012 through 2015, on at least four occasions, Dean reported that Endall directed Dean to pick up gifts from the owner of DF Brother's Gun store in exchange for purchase orders of guns and licenses to the owner.

j) In November of 2015, Dean reported that he saw Alex Lichtenstein with a bag full of hundred-dollar bills sitting out in the open on a chair. Lichtenstein then left the office and told Dean he was going to see Chief Joseph Fox.

k) In March of 2013, Endall & Villanueva established a quid pro quo system with Sal Mistretta, the commanding officer of the Nassau County Licensing Division, whereupon Mistretta would issue licenses for Endall in Nassau County and Endall would issue licenses for people that Mistretta in New York City.

l) In 2013, Endall expedited the application of George Kolitides CEO of Freedom Group (Remington Firearms) and his partner in exchange for Kolitides giving free firearms to Sgt Browne, Det. Novins, and Lt. Ben Gotlieb,

m) Det. Novins, fellow member of the licensing division, and Endall had a close relationship with Centre Firearms and wanted to assist in getting the company a gun smith/gun dealer and range license(s). In exchange for Chief Silks signing off on the paperwork for the licenses, Endall had Dean and Espinel deliver a 4-foot sniper rifle directly to the offices of Chief Silk, the executive officer of Patrol Boro Queens North.

n) Dean identified a business woman to the Government that used to frequent 1 Police Plaza with Orthodox clients whom Endall stated was a person connected to the Mayor. Endall told Dean "this person takes care of Mayor De Blasio and in return we are supposed to take care of this person."

o) Dean reported that gun dealer Wilfredo Vega received a gun dealer license and had his client's applications expedited in exchange for Vega giving Endall and others police paraphernalia and alcohol.

Despite the voluminous information provided by Mr. Dean his cooperation was deemed not substantial.

### B. A Non-Jail Sentence Will Adequately Reflect the Seriousness of the Offense and Provide Just Punishment.

Warren Buffett was once quoted "it takes 20 years to build a reputation and five minutes to ruin it." Had Paul Dean taken that quote to heart its quite possible that he would have never been before this Court. In the day and age of the Internet, and a hyperactive news media, Paul's arrest created permanent stories that Paul will never escape. The toll of the arrest and media attention broke up Paul's potential marriage with Tara McDevitt. **See Exhibit G**: Letter in Support by Tara McDevitt

### C. Paul's Felony Plea is Sufficient to Afford Adequate Deterrence to Criminal Conduct.

The felony conviction that Paul plead guilty to, coupled with the public humiliation and embarrassment that Paul has endured, as well as the financial repercussions of his plea (not being able to work in security as most officers do post-retirement) is a sufficient deterrent for others contemplating breaking the law. No cop wants to go through what Paul has gone through. The only question that remains is what will other officer's think and do if Paul is not shown leniency, particularly when he choose to break the "Blue Wall of Silence."

### D. The Intense Publicity Surrounding Deans's Case and His Status as a Former Cop Weigh Heavily against Imprisonment.

Dean's high-profile arrest argues strongly against locking him up. In prison, Dean's status as a former cop, combined with the extensive publicity attending his case, would either expose him to abuse from fellow inmates or require preventive segregation, forcing him to serve his sentence under unusually harsh conditions. *See United States v. Koon*, 518 U.S. 81, 112 (1996) ("the extraordinary notoriety and … media coverage of this case, coupled with the defendants' status as police officers," make them "unusually susceptible to prison abuse") (internal citation and quotations omitted); *see also United States v. Volpe*, 78 F. Supp. 2d 76, 88-89 (E.D.N.Y. 1999) (same).

"Extreme vulnerability" to in-prison victimization is a factor the Court should consider in fashioning an appropriate sentence. *United States v. Lara*, 905 F.2d 599, 602-03, 605 (2d Cir. 1990) (vulnerability to prison abuse properly considered in reducing sentence); *cf. Koon,* 518 U.S. at 112 (susceptibility to prison abuse "just the sort of determination that must be accorded deference" on review). Because Dean "is to be punished for his crimes," not the "media coverage" accompanying them (*Volpe*, 78 F. Supp. 2d at 89), the interests of justice weigh against a custodial sentence.

### E.  A Custodial Sentence is Unnecessary to Keep Dean from Reoffending.

There is no need to protect the public from future crimes by incapacitating Paul Dean. He presents zero risk of recidivism. Mr. Dean's crimes centered around activity in the police department and now that he is off the force, there is no possibility of repeating the charged crimes again. Aside from the pending offense, Dean has spent his life *fighting* crime – not committing it. He deeply regrets his mistake, and everything in his background cuts against repetition.

Indeed, Sentencing Commission studies demonstrate that defendants in Dean's position – educated, older offenders with no prior criminal history – are exceedingly unlikely to relapse. *See* Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at 6 (2017). As a partial result, the Commission recently amended the Guidelines – by adding a new application note to the Commentary at § 5C1.1 – to endorse sentences other than imprisonment for "nonviolent first offender[s]" falling with within Zones A and B of the Sentencing Table. *See* U.S. Sentencing Commission, Adopted Amendments to the Guidelines (effective Nov. 1, 2018) at 29-30, *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-textamendments/20180430_Amendments.pdf. Dean's risk of reoffending is nil, making prison on incapacitation grounds both gratuitous and superfluous.

IV. **THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES**

Looking at the other defendants who were indicted and sentenced in related cases, the Court has ample reason to downwardly depart and potentially give Mr. Dean a non-jail sentence.

In *USA v. Chambers*, 1:17-cr-00396-WHP, attorney John Chambers, was accused of bribing Sgt. David Villinueva, for over 9 years, and he was found guilty after trial on charges of bribery, fraud and conspiracy charges. U.S. District Judge William Pauley, in imposing a jail sentence of 1 year and 1 day, which included three years probation, said he thought the federal guidelines of 41 to 51 months, which prosecutors requested, was significantly more than necessary.

In, *USA vs Harrington*, 1:16-cr-00468-GHW-2, Ex-NYPD Chief Michael Harrington, plead guilty to misusing police resources, and was sentenced to two-years probation and 180 hours of community service, although facing six months incarceration.

In *USA vs Grant*, et. al., 1:16-cr-00468-GHW, Deputy Inspector James Grant & Civilian Jeremy Reichberg were recently tried as part of the same bribery investigation and Grant was acquitted of all charges related to accepting bribes and Reichberg was convicted of paying bribes and is awaiting sentence.

In *USA vs. Lichtenstein*, 1:16-cr-00342-SHS, Shaya Lichenstein was sentenced to 32 months in jail and ordered to pay a $20,000 fine and undergo alcohol addiction treatment as penance for bribing cops. Prosecutors wanted him to serve 4-6 years incarceration, but the judge cited Lichtenstein's charitable works in giving him a lower-than-expected sentence.

Overall these sentences give the Court a basis for which to downwardly depart from the sentencing guidelines.

V. **CONCLUSION**

In addition to the numerous family and friends referenced above, Paul also has the support of family members Angelo Galeazzi, Meghan Galeazzi, and Kevin Galeazzi who all write about Paul's

17

stabilizing force in their lives and who all seem to indicate how the instant conviction is an aberration in his life.  **Exhibit M**: Letter in Support by Angelo Galeazzi, **Exhibit N**: Letter in Support by Meghan Galeazzi,  **Exhibit O**: Letter in Support by Kevin Galeazzi.

In all Paul's relatives and friends believe he's learned from his arrest and has suffered tremendously already with his arrest and indictment, they know Paul will never falter again.  Paul's friend's and family proudly support him in appealing for leniency in deference to Paul's longstanding career with the NYPD *Porter v. McCollum*, 558 U.S. 30, 41-43 (2009) (defendant's record of "heroic military service" properly considered at sentencing).

It is time for this chapter in Dean's life to come to an end so that he can move on and be fully present [for] his family.  A non-jail sentence will enable Dean to do just that. It is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), and it is the punishment that fits both the offender and his offense of conviction. It is the sentence that's appropriate, and one we respectfully request. *Cf. United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1992) (court should consider whether incarceration will destroy "an otherwise strong family unit").

DATED:      January 23, 2019
            New York, New York

                                              LAW OFFICES OF ABE GEORGE, P.C.
                                                   /s/
                                              By: Abe George, Esq.
                                              44 Wall Street, 2nd Floor
                                              New York, NY 10005
                                              (P) 212-498-9803
                                              (F) 646-558-7533
                                              E-mail: abe@abegeorge.lawyer

cc.   **Via ECF**
      AUSA Kimberly Ravener

18