January 16, 2019

Honorable Edgardo Ramos
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Dear Judge Ramos:

    My name is Tara McDevitt. I have known Paul Dean for over 8 years. We were engaged and lived together until July of last year. We have a five year old son together and I have an almost 10 year old daughter who Mr. Dean has also helped care for over the past 8 years. I am an attorney practicing real estate and construction law at a mid-size firm and have been in practice since 2010. During my time in law school I had the pleasure of interning for a judge in the Southern District of New York at 500 Pearl Street.

    I met Mr. Dean at what was a somewhat difficult time in my life. He was and has always been very supportive of me pursing my career in law. Many times when I was working late he took care of our son and also my daughter. When he was still with the police department he would go into work very early in the morning so that he could get back in time to pick them up from school. For the past two years he has taken our son to school and gotten him off the bus or picked him up from school almost every single day. He has taken my daughter to soccer and other activities as I am not able to working in Manhattan as I often do not get home early enough to take her.

    While Mr. Dean was always a loving and devoted dad to our son, they have become very close over the past two years as he has assumed the role of his primary caretaker during the week. While it used to be that our son would always prefer me over his dad, I have seen that gradually change as they have spent much more time together. My son is living what many little boys could probably only dream about – getting to hang out with his dad every single day. They have become best friends – they are always going to the park, zoo, aquarium, baseball games, to see trains which are his favorite thing, and even taking day trips during breaks and holidays. If he was to lose his dad, even for a short amount of time, I do not think devastated even describes how he would feel. I honestly do not even know how I would explain to him why he could not see his dad every day. I would most certainly have to leave my job in Manhattan for a position much closer to home (at a significant reduction in salary) to not only be able to take care of him physically but even more so for his mental and emotional well-being. We have very little family support as Mr. Dean's parents are deceased and my family is hours away in upstate New York.

    Mr. Dean also had two older daughters who he speaks to almost every day and who spend time with him summers and holidays. His younger daughter is considering coming back to New York for college which I know would make him very happy. However, this is certainly dependent on the outcome of his case – she cannot come to New York if he will not be there.

This "witch hunt" for lack of a better term has caused a great deal of stress and strain on our son, my daughter, myself and Mr. Dean. When Mr. Dean came to me in late 2015 to tell me that another individual who is currently being prosecuted had told him that if he did not feel comfortable taking money that he could have me do it just like his wife did, I gave Mr. Dean a choice – retire or I was leaving. He chose to retire. As I reported to the US Attorney's Office and FBI when I met with them, to my knowledge, Mr. Dean never took any money from anyone except for one instance which he has admitted. Unlike many others, we never went on vacations, never got work done to our home, no jewelry, cars, dinners, wine tours, birthday parties – that is not who we are. When the FBI showed up at our door in April 2017 it was no surprise to me – I knew that Mr. Dean would be set up to take the fall for the actions of others. Mr. Dean was very open with me about what was going on in the License Division, and he was the only person keeping the office functioning. He was not the boss as is being portrayed – he was forced to step into that role because the actual boss did not do his job and, quite frankly, is responsible for what transpired. One thing I will never forget, and that I shared with the US Attorney's Office and FBI when I met with them, was driving all the way out to Smithtown with Mr. Dean when our son was only a few months old to pick up a vehicle at a Cadillac dealership for the 'boss'. I could not understand why we had to do something like that. In hindsight, it is indicative of how the License Division functioned – the 'boss' just directed what was to be done, and had others do that 'dirty work' for him.

I did not know Mr. Dean as a street cop but it is obvious from hearing him talk about it that he loved being a cop. What I do know and what I did see is that he cared for every cop and every person under his command. As I told Probation Officer Pagano, part of Mr. Dean's downfall was that he was too nice – he did not say no enough. As a boss, he was very well liked by everyone – I often stopped in the License Division after court appearances at 60 Centre Street. On more than one occasion when a PAA or part of his staff was sick, he personally either took them to the doctor or made sure someone else did. He treated everyone equally and fairly. I distinctly remember the pain and regret he felt when one of his cops, who he had brought to the License Division having worked with him previously, had a heart attack at the office on a day that he happened to not be in the office and passed away. Apparently he had been complaining that day that he was not feeling well and Mr. Dean felt that if he had been there that day that he could have done something. That is the kind of person Mr. Dean is – he cares about and looks out for other people and does not think about himself. He would have never knowingly broken the law and in all honesty I do not believe he thought he was doing anything wrong. People much higher than him came in and asked for favors all the time. People were taken care of. It was the custom, culture and practice in the License Division but only a select few have been singled out to pay the price for it.

This case put a great deal of strain on my relationship with Mr. Dean. As other cases proceeded along with his own, Mr. Dean spent countless hours on his computer listening to recordings and going over documents. He became withdrawn – he spent hours and hours going over documents to be able to show that he had done nothing wrong, and that those who the government was and continues to rely on had done nothing but lie and/or fail to tell the whole truth. I was unhappy but trying to keep our family together for our son. Finally, for many reasons, I moved out in July 2018. This has put a great deal of additional stress on me and my children. Not knowing what is going to happen I do try and let our son spend as much time with

his dad as possible. My relationship with Mr. Dean has improved but I do not know that it will ever get back to what it used to be. This case has changed him and turned him into someone he is not.

In my mind, the recent acquittal of James Grant speaks volumes. A jury of Mr. Grant's peers saw the case for what it was – picking on the little guy, the easy target, while apparently consciously choosing to not go after the "higher-ups" who had done no less than Mr. Grant. That is probably what upsets me most, and I expressed this to the US Attorney's Office and FBI during our meeting. I admittedly sat on the retributivist side of the 'retributivist v. utilitarian' debate in first year criminal law – if you do the crime you do the time so to speak. But what has transpired here has questioned my faith in our system of justice, even more so upon learning that the US Attorney's Office never informed Mr. Dean after I met with them in July 2018. In fact, I was encouraged not to share with Mr. Dean that I'd spoken to them in the interest of my own physical safety.

I am a civil litigator – I fight over money. No one's physical liberty is at stake. No one will walk around with a label for the rest of their lives. The story told in the media regarding Mr. Dean's case, media that will not just fade away as it may have before the age of the internet, paints a picture which could not be further from the truth. I feel lucky that our son is at an age where he is too young to really be affected by this media. He and his friends aren't reading the newspaper. I have also been lucky to have friends who have been very supportive, though am keenly aware that there are those who certainly are judging. But these stories floating around the internet won't magically disappear once this is over. Maybe one day we will discuss this with our son so he is prepared if, one day, someone asks him what his dad did that got him criminally prosecuted in federal court. I hope and pray this day never comes.

I ask that Your Honor show Mr. Dean leniency for the sake of his children, especially our son. During the holidays, I took my son and daughter upstate for a few days to see my family. Every day my son asked when he would be seeing his dad, and he FaceTimed him a few times a day. That was a few days. I cannot imagine the impact that not seeing his dad for months at a time would have on him, both in the short term and in the long term.

As the sentencing date approaches I have had many sleepless nights as the anxiety of not knowing what is going to happen and the possibility of our son losing his dad, even if for a short time, increases day by day along with the dread of how I could possibly explain to my son why he is not able to see his dad. By showing Mr. Dean leniency at his sentencing, I can only hope that the healing process will be able to begin for all of us as we move on and try to find some sense of normalcy.

I thank Your Honor for your time and consideration.

Very truly yours,

Tara D. McDevitt