J1vWdeaS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        17 Cr. 398 (ER)

5    PAUL DEAN,

6

7                   Defendant.

8                                        Sentence

     ------------------------------x
9                                        New York, N.Y.
                                         January 31, 2019
10                                       2:30 p.m.

11   Before:

12
                        HON. EDGARDO RAMOS,
13
                                         District Judge
14
                             APPEARANCES
15
     GEOFFREY S. BERMAN
16        United States Attorney for the
          Southern District of New York
17   BY:  KIMBERLY J. RAVENER
          Assistant United States Attorney
18
     ABRAHAM GEORGE
19        Attorney for Defendant

20

21

22

23

24

25


                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

J1vWdeaS

1          (Case called)

2          MS. RAVENER:  Good afternoon, your Honor.  Kimberly

3     Ravener, for the government.

4          THE COURT:  Good afternoon.

5          MR. GEORGE:  Good afternoon, your Honor.  Abe George,

6     for Paul Dean.

7          THE COURT:  And good afternoon to you.

8          This matter is on for sentencing.  In preparation for

9     today's proceedings, I have reviewed the following.

10          I've reviewed the presentence report, last revised on

11     November 5, 2018, prepared by U.S. Probation Officer

12     Christopher Paragano, which includes a recommendation.  I've

13     also reviewed the sentencing letter submitted by Mr. George,

14     dated January 23, 2019, which includes a statement written by

15     Mr. Dean as well as various of his family members.  I've

16     reviewed the government's submission, dated January 28, 2019.

17     And finally, I've reviewed a letter delivered by hand yesterday

18     by Mr. John Chambers, who was separately charged in a related

19     investigation.  That letter is dated January 25, 2019, and I've

20     provided that letter to the parties.

21          Is there anything else that I should have received or

22     reviewed?

23          Ms. Ravener.

24          MS. RAVENER:  No, your Honor.

25          THE COURT:  Mr. George.

J1vWdeaS

1        MR. GEORGE:  No, your Honor.

2        THE COURT:  Mr. George, have you read the presentence

3   report and discussed it with your client?

4        MR. GEORGE:  Yes, your Honor.

5        THE COURT:  Mr. Dean, have you read the presentence

6   report and discussed it with your attorney?

7        THE DEFENDANT:  Yes.

8        THE COURT:  Are there any objections to the report

9   regarding its factual accuracy?

10        MR. GEORGE:  No, your Honor.

11        THE COURT:  Ms. Ravener.

12        MS. RAVENER:  No, your Honor.

13        THE COURT:  Very well.

14        Although I am not required to impose a sentence within

15   the sentencing guidelines, I am required to consider that range

16   in imposing sentence, and in order to do so, I need to make a

17   calculation.

18        Mr. Dean pleaded guilty to Count Two of the

19   indictment, which charges him with conspiracy to violate 18

20   U.S.C. Section 666.  The base offense level for that offense is

21   a 14, because he was a public official at the time of the

22   commission of the offense.  Four levels are added, pursuant to

23   Section 2C1.1(b)(3), because he was a high-level decision-maker

24   in a public position during the commission of the offense.

25   Finally, three levels are deducted for Mr. Dean's acceptance of

J1vWdeaS

1    responsibility, yielding a total offense level of 15.  Because

2    he has no prior convictions, Mr. Dean is in criminal history

3    category I.

4              Are there any objections to that calculation?

5              Ms. Ravener.

6              MS. RAVENER:  No, your Honor.

7              THE COURT:  Mr. George.

8              MR. GEORGE:  No, your Honor.

9              THE COURT:  Very well.

10             Based on the parties' representations that they agree

11   with the guideline calculation as I've indicated and as also

12   represented in the presentence report as accurate, I accept the

13   guideline calculation in the presentence report and find that

14   the criminal history category is I and the total offense level

15   is 15, yielding a guidelines range of 18 to 24 months.

16             Ms. Ravener, does the government wish to be heard

17   prior to the imposition of sentence?

18             MS. RAVENER:  Briefly, your Honor.

19             As set forth in our submission, which details much of

20   the relevant conduct and facts, Mr. Dean was not only supposed

21   to be a member of the New York City Police Department, in and

22   of itself trusted and valuable in our society, that carries

23   very special duties to the people of the state of New York, but

24   he was also supposed to be a leader.  He was supposed to be a

25   model, and as the executive officer of the license division,

J1vWdeaS

1    the second in command of that division, he not only watched a

2    tidal wave of corruption take over in the license division, he

3    joined it.  He participated in it, and he doubled down when he

4    retired, because his greed during that time had only grown, and

5    it's for those reasons that Mr. Dean is before the Court today.

6          He planned and conspired to pay bribes himself to the

7    very New York City police officers who had been under his

8    command.  He plotted to take a cut from the gun license

9    expediters that were already engaged in bribery at the license

10   division, and he perpetuated the corruption that was occurring

11   there.

12         For those reasons, we submit that a sentence

13   consistent with the guidelines range is appropriate for

14   Mr. Dean.

15         THE COURT:  Can I ask you, Ms. Ravener, how big is the

16   licensing division?

17         MS. RAVENER:  I believe there were approximately 40

18   New York City Police Department officers working in the license

19   division when Mr. Dean was there, and that they accept about

20   5,000 applicants per year for review.

21         THE COURT:  Applicants for gun permits?

22         MS. RAVENER:  Correct.  That's the volume of business

23   being done in the license division on average.

24         THE COURT:  And I take it that the government did not

25   conclude as a result of its investigation that all 40-plus

J1vWdeaS

1    members of the licensing division were involved in corrupt

2    activity.

3              MS. RAVENER:  Correct, your Honor.  We did not.

4              THE COURT:  Thank you.

5         Mr. George, did you wish to be heard before the

6    imposition of sentence?

7              MR. GEORGE:  Yes, your Honor.

8         May I move over to the lectern?

9              THE COURT:  Absolutely.

10             MR. GEORGE:  Good afternoon.

11        I think the one thing that Mr. Dean can agree with --

12   with the government and the probation report -- is that if the

13   judge were to pursue a sentencing guideline recommendation, as

14   the government said, and the probation department, the very

15   ceiling should be the minimum of 18 months.  And as the

16   government has asked for in their sentencing recommendation,

17   the most that the Court should fine him is $1,000.  But I

18   submit there are numerous reasons that this Court should not be

19   held to this and that it should depart from the sentencing

20   guidelines.

21        I think the main discrepancy that appears to be the

22   point of contention is what Mr. Dean's role was in this

23   conspiracy and in this corruption and exactly what his conduct

24   was.

25             When we pled guilty before the Court in April of 2017,

J1vWdeaS

Mr. Dean, as the Court will remember, said he agreed to the

fact that near the end of his career with the NYPD, between

November 2015 and January of 2016, I agreed with other members

to bribe Ochetal and Villanueva, whom I knew were being bribed

already, when I retired from the police department to be an

expeditor.

          That fact is important, because the government's

portrayal of Mr. Dean as the high-ranking member of the

licensing division seems to imply that it was because of him

that the corruption was occurring within the license division,

but the corruption would predate Paul's role as lieutenant.

          If the Court looks at the indictment himself, Paul

Dean only achieved the role of the second in command in 2014.

That's when he became a lieutenant.  But if you look at the

indictments of Villaneuva and others, the corruption was

occurring well before Paul Dean took the slot as No. 2.

          Who had that slot of No. 2 before Paul Dean?

          It was Mike Endall, Mike Endall, who later become the

commanding officer at the licensing division when Paul Dean

took the No. 2 slot.  So clearly, Officer Villaneuva, who pled

guilty and was a cooperator for the government, was engaging in

corrupt acts with someone other than Paul Dean before Paul Dean

took that title, took that role.  And one thing that the Court

did not know when we took the plea was the efforts that Paul

had made to try to stop the corruption, and the very fact

J1vWdeaS

1   itself that even though he agreed to conspiracy to bribe

2   officers while he was retired, in an expediting capacity, that

3   this never got off the ground.  Judge, he didn't bribe one

4   member of the police department the.

5          Why?  Because when he retired, he couldn't bring

6   himself to pay another officer money for a gun license.

7          As Paul was continuing in his retired career as an

8   expeditor, he had heard people were continuing to pay cash for

9   gun licenses.

10          So what did Paul do?

11          Paul went to Mike Endall, the commanding officer of

12   the license division, and told him, Look, I don't know if you

13   know this, I know you're OK with gifts and services -- and

14   that's a distinction I'll get to in a few minutes -- but people

15   are selling gun licenses for cash, and people in your division

16   are getting it.

17          How do we know this, Judge?

18          Well, we received from a reporter a specification that

19   Mike Endall, when he retired, pled guilty, and that's Exhibit

20   D -- and I think that's a very significant exhibit that the

21   Court should look at -- that when Mike Endall retired, one of

22   charges he pled guilty to was failing to conduct an

23   investigation or failing to report corruption when a member of

24   the service told him about what was going on.  And Judge, I

25   submit that that document really should have been turned over

J1vWdeaS

1   at some point before Mr. Dean's plea.  We're not saying that we

2   want his plea back or anything.  He accepted the circumstances

3   and pleaded guilty before your Honor, knowing all the

4   circumstances, but that's a significant document.

5          Why?  Because it goes directly to his conduct.  Paul

6   never got this conspiracy off the ground, and Paul made

7   attempts to try to stop it, even when he was a retired police

8   officer, Judge.

9          One factor that the Court needs to look at as well is

10  what other related defendants received in their sentencing;

11  what happened with the other folks here?

12         Well, John Chambers, one of the lawyers that's

13  referenced in Paul's indictment and an attorney that wrote a

14  letter to this Court, that I'll get into in a few minutes, did

15  not cooperate with the government, went to trial, and at

16  sentencing the government asked for a guideline of 41 to 51

17  months.  Justice Pauley sentenced him to a year and a day.

18         In the case of Inspector Chief Michael Harrington, who

19  pled guilty to misusing police resources, instead of the

20  maximum six months' incarceration, he was allowed to plead and

21  received a sentence of two years' probation.

22         In the case of Shaya Lichtenstein, who was the

23  centerpiece behind all the corruption in Mr. Dean's case, the

24  government wanted a range of four to six years of

25  incarceration, but the court downwardly departed and sentenced

J1vWdeaS

1    him to 32 months.

2              In the case of Inspector Grant and civilian Jeremy

3    Reichberg, and Jeremy Reichberg, as the Court may know, was

4    someone that was accused of bribing police officers, the jury

5    acquitted James Grant of receiving bribes.

6              Judge, one of the things that you need to take into

7    consideration is the fact if this Court was to give Mr. Dean

8    jail, his status as a police officer makes him a vulnerable

9    victim.  His picture's been plastered all throughout the

10   newspapers, media, television.  People know who Mr. Dean is.

11   Sentencing him to jail would put him in a vulnerable position

12   that other inmates wouldn't necessarily be exposed to.

13             Looking at Paul as an individual, as a human being,

14   Paul had been at the NYPD for over 22 years before he retired.

15   He was a decorated officer.  He had over 160 arrests.  He took

16   the job when he was 21 years old, because he saw his parents,

17   who were two social workers, dedicated to city service, and

18   that's what he wanted to do.  He moved around and he was

19   promoted to sergeant, lieutenant.

20             A week before 9/11, Paul had his second child, and

21   Paul had scheduled vacation to stay with his second child.  But

22   when Paul heard that the buildings collapsed, Paul was a first

23   responder.  Paul saw friends of his pass away.  And as your

24   Honor could read from the probation report, this is something

25   that he's not comfortable talking about, and had difficulties

J1vWdeaS

mentally from that experience.  But Paul Dean, up until this

point, was a dedicated public servant that put his life and put

the NYPD's life, the mission of the NYPD, first.

Now, Judge, I submit all of those reasons and the fact

that he's got three children, one of which is five years old

and he's the primary caretaker, all of those reasons in and of

itself warrant a downward departure from the sentencing

guidelines, and I suggest a nonjail sentence.  But that's not

including the fact that Paul did the one thing that New York

City police officers are constantly put with this label of not

breaking the blue wall of silence.

When Mr. Dean was arrested, he was cooperative.  He

came in to the government three times, and one of the reasons

that we alleged and gave to the Court most of his information

that we relayed over was the fact that during the course of

while we were out pending sentence, we learned that 305s were

turned over that detailed the fact that Paul went in to

cooperate.  Paul heard that indirectly:  Hey, you went in to

the government to talk?  You said this and that?

And that was without the benefit of a 5K letter.

Judge, one of the reasons we put this information out

there was for the Court to see how forthright Mr. Dean was.

What Mr. Dean described was a culture of corruption that

pervaded the license division, and what the Court should note

is that you don't get to be commanding officer of the licensing

J1vWdeaS

1    division because of your merits.  It's about the people you

2    know.

3         Mike Endall was placed as the commanding officer of

4    the licensing division because he would protect the delicate

5    balance of doing favors for certain members of the public as

6    opposed to the general public that had concrete rules on how to

7    get licenses.

8         How do we know this?

9         This goes back to the fact that Villaneuva, Sgt.

10   Villanueva, and Richard Ochetal were processing and engaged in

11   corrupt practices before Paul Dean took his role as No. 2 of

12   the licensing division.

13        Who had that role before Paul Dean?  Mike Endall.

14        Mike Endall had graduated to head of that department,

15   his boss.  He knew that Mike Endall was in the regular practice

16   of giving out licenses to people that were favored, people that

17   knew other folks, and he was told specifically by Mike Endall:

18   Anything Villaneuva gives you, approve.

19        Why am I bringing that up, Judge?

20        I'm trying to explain why Mr. Dean got into this

21   pattern and how he fell into the corruption, because your

22   supervisor is placed there and blatantly knows of activities

23   that are happening in terms of favors; Paul Dean was left with

24   limited choices.  He saw that inspectors and other higher-ups

25   also knew what was happening, but no one was doing anything to

J1vWdeaS

1    stop it.

2              A letter was submitted to the Court a few days ago, or

3    yesterday, by an attorney, John Chambers, who was convicted, as

4    I discussed before, and he pointed out what he thought was a

5    fallacy in some of the information that Mr. Dean provided.  But

6    I submit, after talking to Mr. Dean, Mr. Chambers knew that

7    although it wasn't -- that the person he referenced, the actor,

8    did have a felony conviction, whether or not it was sealed or

9    not was still a factor that would negate this particular actor

10   from getting a gun license.

11             Whatever Mr. Dean said in his cooperation was true.

12   There isn't any allegation that Mr. Dean wasn't forthright, and

13   what I submit, if you look at all the allegations and all these

14   statements that Mr. Dean had made in his cooperation agreement,

15   he certainly points to one thing: that Mike Endall was involved

16   in corrupt practices.  He certainly had enough information that

17   he relayed over that should have been able to build a case

18   against Mike Endall, but Mr. Dean was the last person arrested

19   in the alleged corruption scheme.

20             Judge, for the rest of Mr. Dean's life, he'll have to

21   wear the scarlet letter of being a corrupt cop and being a

22   snitch.  I implore this Court to temper justice with mercy and

23   allow Mr. Dean a nonjail sentence.

24             I'm open to any questions that the Court might have.

25             THE COURT:  I do have a couple questions, Mr. George.

J1vWdeaS

1          In your letter and again in your presentation this

2     afternoon, you frame Mr. Dean's involvement in this conspiracy

3     almost exclusively in terms of Count Two to which he pled.

4     However, as you are aware, the presentence report discusses any

5     number of instances where Mr. Dean, while he was in the

6     licensing division, himself accepted gratuities, cash, etc.

7          Shouldn't I take all of that into account as well?

8          MR. GEORGE:  Judge, there, and this was the delicate

9     balance that we were trying to strike.  Certainly Mr. Dean and

10    in his proffer agreements did state that there were certain

11    gratuities that he did accept, but what's in dispute is whether

12    or not he did those things to facilitate someone that has --

13    that didn't deserve a gun license.  There were many licensees,

14    as the culture of corruption that was occurring within the

15    division, that when they got licenses, on their own, they would

16    give over gratuities, invite them over for meals, invite them

17    for services and things of that nature, so it wouldn't be fair

18    for Mr. Dean to say some of that is not true.

19         And in fact, in my memo to the Court, we readily

20    admitted that the only cash that Mr. Dean is alleged in the

21    government indictment and even in the PSR was $1,000, which he

22    received directly from Villaneuva and not from one of the

23    expeditors in this case.  So, I think we had a difficult

24    balance in disputing some of the aspects of the presentencing

25    report.

J1vWdeaS

1          THE COURT:  Ms. Ravener, I have a question for you.

2          Mr. George spoke about some of the individuals and

3     related prosecutions and the sentences that they received.

4          What, in the government's estimation, is Mr. Dean's

5     relative culpability vis-à-vis those individuals?

6          MS. RAVENER:  Your Honor, that's a question that

7     varies, and so if you give me a moment to walk through each of

8     those cases somewhat.

9          THE COURT:  Sure.

10         MS. RAVENER:  With respect to Mr. Chambers and

11    Mr. Lichtenstein, those are both individuals who were in the

12    class of expeditors, who were paying bribes to officers of the

13    New York City Police Department at the license division.  Both

14    received incarceratory sentences, and if you're looking at it

15    in terms of the volume of bribes paid or the quantity of bribes

16    paid, then those individuals paid a greater sum of bribes, that

17    they acted on their scheme, than Mr. Dean did in terms of his

18    postretirement conspiracy.

19         However, those people didn't owe the duty that Paul

20    Dean owed as a member himself of the NYPD, as a high-ranking

21    official in a sensitive position, entrusted to evaluate the

22    very question of whether a gun license should be issued.  In

23    fact, in Mr. Dean's role, he was overseeing the approval of

24    many of the licenses sought as part of those expeditors'

25    efforts.

J1vWdeaS

1          THE COURT:  Have other members of the service been

2     sentenced?

3          MS. RAVENER:  Your Honor, not yet in connection with

4     this scheme, and that is because Mr. Villaneuva and Mr. Ochetal

5     were both charged in connection with this same scheme, and they

6     have pleaded pursuant to cooperation agreements.  They are

7     pending sentencing.

8          THE COURT:  OK.

9          MS. RAVENER:  But out of the people who have been

10    charged, Mr. Dean is the highest ranking member of the license

11    division.  He had an oversight role for Villaneuva and

12    Ochetal's conduct.

13          I think that it's a multifactorial analysis before the

14    Court in terms of culpability, and so it's his role that sets

15    him apart.  It's his rank and position that set him apart from

16    both the people who were lower ranking officers who were

17    accepting bribes, like Villaneuva and Ochetal, and the

18    expeditors like Lichtenstein and Chambers.

19          THE COURT:  Thank you.

20          Mr. Dean, you have an absolute right to address the

21    Court before I impose sentence.  Is there anything that you

22    wanted me to know?

23          THE DEFENDANT:  Yes, your Honor.

24          May I go to the lectern?

25          THE COURT:  Absolutely.

J1vWdeaS

1        THE DEFENDANT:  As I stand before you and my family, I

2   want everyone to know that I take full responsibility for my

3   actions.  Only I alone can be held accountable for them.  I

4   betrayed the trust given to me as a police officer, and it has

5   burdened myself and my family.  Being a corrupt cop is a label

6   I will wear for the rest of my life.

7        For 22 years of my life, I identified myself as a

8   police officer, who made this one true dream job, and I had the

9   privilege of being part of the greatest police department in

10  the world.  It is why, first and foremost, before I say

11  anything further, I would like to apologize to the men and

12  women of the New York City Police Department and the people of

13  the city of New York.  It comes down to I was a police officer

14  and should have known better.  My actions and the publicity

15  surrounding them have done nothing but tarnish the hard work

16  that these men and women do every day.  My actions are not

17  indicative of what the true rank and file of the NYPD is, and

18  to them I'm deeply, heartfeltly sorry.

19       To my friends and family, especially my children, I'm

20  truly sorry for all the pain and suffering I've caused you.

21  Nothing I could do or say can repair what I put you all

22  through.

23       Your Honor, for the past 22 months, I've been, for

24  lack of a better word, living a nightmare.  My life has been

25  destroyed because of my actions.  It's why I immediately took

J1vWdeaS

responsibility for them, cooperated with this investigation, and pled guilty before you.

Though it does not excuse my behavior, and in no way am I trying to deflect or marginalize what I've done, in my own words, I want to explain why I did this.

After graduating from the academy, I was assigned to the 13th Precinct in Manhattan, and after a few years, I studied and became a sergeant and went to the 102nd Precinct in Queens. I eventually worked in the detective's squad. The hours were long and the work was grueling, but I enjoyed every moment of it. Being a street cop and working in the detective bureau were the best days of my career.

I was promoted to lieutenant, assigned to the 104th Precinct. My hard work as a sergeant stood out, and the captain who I worked for in the 102nd Precinct asked me to come work for him in the license division. Little did I know that would be the biggest mistake of my life.

About a year after I was in the license division, I started to notice that there were two paths for people applying for licenses: one for the average person, where all the rules applied; and another for those who were connected, where rules and criteria didn't.

This is when I started to realize people connected to the higher-ups in the department were being funneled directly to the second in command, Michael Endall. First I thought this

J1vWdeaS

was strange, but then I realized captains, inspectors, chiefs,
and even the police commissioner, knew what Endall was doing.
So, who was I to say what he was doing was wrong?

During this period, gifts, meals and other gratuities
were commonplace.  What I saw, people were grateful for getting
their licenses, and gifts were dropped off.  These same people
would openly boast about their connections to the higher-ups
and how they had given them gifts.

In August 2014, Endall took over and it was a
free-for-all, and it became very difficult to be a manager.  He
was a very lax supervisor, meaning Endall, and the rules were
thrown out the window.  I began to see a change in how things
were done.  I was instructed by Mike Endall to approve all
license applications given to me by Villaneuva.  Eventually
things began to spin out of control, and for certain people
gifts turned into cash.

That's when I thought I should retire and wanted to go
into the expediting business myself, and out of greed, I went
into a deal to give gifts or cash to those who were expediting
licenses, but shortly thereafter, agreeing to do this, I
realized I couldn't bring myself to bribe cops who never went
through with this plan.

After I retired and I went into the expediting
business, people began freely telling me about how licenses
were being blatantly sold by Dave Villaneuva.  I knew Endall

J1vWdeaS

had no problem with gifts.  It was cash that he always told me

was a problem.  I did my best effort to tell Endall and

honestly did not know what else to do.  The first time he told

me -- I told him, he told me he put things in place to make

sure it never happens again.  I didn't know if he knew that it

was still going on afterwards.  I did what I thought was right,

and I wanted to stop them but didn't want to be a witness

against them, and in the end, maybe I should have done more.

            As you know, your Honor, on three separate occasions,

I spoke with the government to divulge the corruption within

the NYPD.  Each time I was never given assurances of a

cooperation agreement, but I wanted them to know exactly what

was going on.  And each time before I began telling the U.S.

Attorney and FBI what I knew, I was instructed that if I lied

at any point I could be charged with making a false statement.

I've been labeled a lot of things the past 22 months, but one

thing I'm not is a liar.  I've given the government credible,

firsthand, intimate knowledge of criminal conduct within the

NYPD.

            Though I've been on the receiving end of a large

amount of animus from the representatives and the individuals

who were involved in these corrupt deeds and have received

numerous anonymous threats, I now live with constant fear of

being harmed for speaking out.  I want people to know that

this -- I want people to know that it is better to cooperate

J1vWdeaS

with the government than to go against them.  Use me as an
example, that even if high-profile people are against you, it's
best to tell the truth.

Your Honor, as you know, I have three children who
rely on me daily to provide for them, especially my son, who
lives with me full time.  In the past three years, I've been a
stay-at-home father, and for me, that's the most important job
in the world.  I'm a loving, caring father who has never
stepped away from them, stepped up and never shirked his
responsibilities.  All three of them have missed out so much in
life because of the sacrifices I made to the NYPD, especially
my daughters, who are old enough to remember seeing my devotion
to my career and the negative effects that this case has
brought upon them.

There have been many tears over the years, in past 22
months in particular.  But each time, I've always tried to keep
our fractured little family together.  It's why if I am
incarcerated it will destroy what little I have left with my
daughters and have a significant, devastating effect on my
five-year-old son.

This whole process has paralyzed our lives.  It's as
though we were all in prison together.  My daughters need me to
be there for them and guide them through adulthood, especially
my 17-year-old daughter, who had made plans to come to New York
to attend college.  Now we don't know if that could happen.

J1vWdeaS

1          As I dropped my son off to school this morning, I knew

2     today would impact his life forever, and not in a good way.

3     Your Honor, the two of us are not just father and son but best

4     friends.  In an age where men cast away -- aside their

5     responsibilities to their children, I am one who embraces it.

6          I will not extol to you the countless sacrifices I've

7     made for the NYPD and the people of New York City.  That's not

8     who I am.  I will say this, though.  I've placed my life in

9     danger numerous times, without regard for my own personal

10    safety, and in doing so, I've suffered both physically and

11    mentally.  I have left parts of myself on the streets of New

12    York City.  One true lesson I have learned in my career is that

13    people are not infallible and to be empathetic towards others.

14         Your Honor, I hope in sentencing me you take into

15    account several things: my immediate acceptance of

16    responsibility for my actions and pleaded guilty; my respect

17    for the law in cooperating with the U.S. Attorney's Office and

18    FBI; and most importantly, my devotion and sacrifices that I

19    made during my career; and most importantly; and ultimately, my

20    responsibilities I have in raising my daughters, especially my

21    son.

22         That is why, with great embarrassment and shame, I beg

23    of you for leniency in my sentence.

24         Thank you.

25         THE COURT:  Thank you, Mr. Dean.

J1vWdeaS

1          In deciding what sentence to impose, in addition to

2     the sentencing guidelines, I have considered all of the factors

3     set forth in Section 3553(a) of Title 18 of the United States

4     Code, including, as most relevant to Mr. Dean's case, the

5     nature and circumstances of the offense and his history and

6     characteristics.

7          I've considered the need for the sentence imposed to

8     reflect the seriousness of the offense; to promote respect for

9     the law; to provide a just punishment for the offense; to

10    afford adequate deterrence to criminal conduct; to protect the

11    public; and to provide Mr. Dean with needed educational and

12    vocational training or medical care, as necessary, in the most

13    effective manner.

14         I've considered the need to avoid unwarranted sentence

15    disparities among similarly situated defendants and to provide

16    restitution to any victims of the offense.

17         Having considered all of these factors, it is my

18    intention to impose a sentence of 18 months to be followed by

19    two years of supervised release, a $100 special assessment and

20    a fine of $7,500.

21         I believe that this sentence is sufficient, but not

22    greater than necessary, to comply with the purposes of

23    sentencing for the following reasons:

24         This is a very serious offense, involving public

25    servants who were entrusted with keeping all of us safe by

J1vWdeaS

1   ensuring that guns didn't get into the hands of the wrong

2   people.  Instead, Mr. Dean and his coconspirators turned the

3   police department's licensing division into their personal

4   criminal enterprise.

5       I just learned this afternoon how large the licensing

6   division was, and it was my working assumption that it was

7   comprised of individuals –– many individuals –– who, unlike the

8   coconspirators, did their jobs well and with integrity.  Based

9   on the information before me, the corruption was sufficiently

10   pervasive that it allowed a small industry of so-called

11   expeditors to thrive, and it is certainly the case, as

12   Mr. Dean's plea conclusively established, that the corruption

13   went to the highest levels of the division.

14       The very fact of an expeditor industry and that it was

15   known to the police department should, to my mind, have been a

16   huge red flag.  Aside from helping an applicant fill out the

17   necessary paperwork and perhaps counsel them through the

18   interview process, I can think of no value that such a person

19   can legitimately otherwise provide.  It certainly should not

20   have been the case that anyone should have been able to

21   expedite an application; that is to say, get someone's

22   application to the head of a line that I understand to be quite

23   lengthy.

24       To be sure, in the scheme of things, the gratuities

25   that were received by the members of the division were not

J1vWdeaS

outrageously extravagant: free dinners at restaurants; free

cases of beer; car repairs; trips to strip clubs.  So far as I

know, no one got rich, but that is not to say that there was no

harm done.  The investigation revealed that in exchange for

gratuities, the officers approved gun permits for individuals

who should never have received them, individuals with

substantial criminal histories, including individuals with

convictions for weapons or violence and individuals with

histories of domestic abuse.

In the way that Mr. Dean described, and his attorney

described, his involvement, to my mind, suggests that Mr. Dean

has not completely accepted responsibility.  He described it as

though he entered a situation where he was powerless to do

anything about the corruption that he saw with his own two eyes

taking place every day.  Mr. Dean was a lieutenant in that

division and had a responsibility -- a duty -- to report that

information as soon as he saw it.  And it was not just that

they were doing favors for VIPs or for celebrities; they were

doing these things in exchange for, and actively soliciting,

these gratuities.

There is as well another type of harm that is

important, to my mind, involving the corrosive effect of this

type of corruption on the public's trust in the police

department.  We require a high level of integrity of our police

officers, and we do so for a reason.

J1vWdeaS

It is because we give them an awesome amount of responsibility.  Police officers can, on what they determine to be good cause, deprive any one of us of our freedom.  Because we live under the rule of law, they do so with impunity until a neutral magistrate determines whether the arrest was justified.  If our system is to work and our society kept safe, the public has got to have faith that police officers are doing their jobs fairly and with integrity.  Please understand that I do consider this to be a very serious offense, and because general deterrence is an important consideration here, it is an offense that deserves a term of imprisonment.

But I have to consider the other side of the ledger as well: Mr. Dean's history and characteristics.

In that regard, please be assured that I read Mr. George's submission very carefully as well as the letters that were submitted by Mr. Dean and his family.  I do not doubt for one minute the sincerity of the information that they provided or their feelings for Mr. Dean.  It is clear to me that he is an individual that is very capable of inspiring the admiration and the affection of those who come in contact with him.

It is also clear to me that in many ways Mr. Dean was a very good cop, who earned commendations for his service and steadily climbed his way up through the ranks because of his good work.  He spent many days at the World Trade Center site

J1vWdeaS

1    and otherwise devoted his work life to the department.  Indeed,

2    as is suggested by the letters that I received, it is his

3    dedication to the police department that led in some fashion to

4    the breakup of his first marriage.

5          By all accounts, he is a wonderful father and a

6    dedicated father, a family member and friend.  He built a good

7    life for himself and for others.  He clearly is not beyond

8    redemption.  Specific deterrence does not require a lengthy

9    prison sentence in this case, because I am convinced that he

10   poses no threat to offend again.

11         I believe that Mr. Dean is sincere about his

12   contrition and give him credit for promptly accepting

13   responsibility and providing the government with additional

14   information.  All of the foregoing is why, consistent with the

15   probation department's recommendation, while I believe that a

16   sentence of incarceration is necessary, I believe that a

17   sentence at the bottom of the guidelines range is sufficient,

18   but not greater than necessary, to serve the purposes of

19   sentencing.

20         Does counsel know of any legal reason, other than what

21   has already been stated, why the sentence should not be imposed

22   as I have indicated?

23         Ms. Ravener.

24         MS. RAVENER:  No, your Honor.

25         THE COURT:  Mr. George.

J1vWdeaS

1          MR. GEORGE:  No, your Honor.

2          THE COURT:  In that event, it is the judgment of the

3  Court that Mr. Dean be sentenced to 18 months on the one count

4  of conviction to be followed by two years of supervised

5  release.

6          The standard conditions of supervised release shall

7  apply as well as the following mandatory conditions:

8          You must not commit another federal, state or local

9  crime;

10          You must not unlawfully possess a controlled

11  substance; and

12          You must refrain from the unlawful use of a controlled

13  substance and submit to a drug test within 15 days of release

14  from imprisonment and at least two periodic drug tests

15  thereafter, as determined by the probation department.

16          The special conditions are that you must provide the

17  probation officer with access to any requested financial

18  information;

19          You must not incur new credit charges or open

20  additional lines of credit without the approval of the

21  probation officer unless you are in compliance with the

22  installment payment schedule; and

23          It is recommended that you be supervised by the

24  district of your residence in the event that you do not live in

25  the Southern District of New York upon your release.

J1vWdeaS

1        You are ordered to pay the mandatory special

2    assessment of $100, which shall be due immediately, and a fine

3    of $7,500, which shall be paid in an amount of no less than 10

4    percent of your gross monthly income.

5        No restitution is required in this case.

6        Is the government seeking forfeiture?

7        MS. RAVENER:  Your Honor, the government proposed a

8    $1,000 amount of forfeiture to correlate to the cash payment

9    that Mr. Dean concedes he accepted.

10        THE COURT:  I will impose forfeiture in the amount of

11    $1,000.

12        Are there any open counts, Ms. Ravener?

13        MS. RAVENER:  Yes, your Honor, and at this time the

14    government would move to dismiss the open counts.

15        THE COURT:  That application is granted.

16        Mr. Dean, I believe that you, in your plea agreement

17    with the government, indicated that if you were sentenced to a

18    term of imprisonment within the stipulated range, which was 18

19    to 24 months, you were essentially giving up your right to

20    appeal, all of which is to say that because I sentenced you

21    within that range, your appellate rights are severely

22    constricted.

23        But Mr. George, will you assure me that you will

24    promptly and thoroughly discuss with Mr. Dean the effect of the

25    plea agreement on his appellate rights?

J1vWdeaS

1              MR. GEORGE:  Yes, your Honor.

2              THE COURT:  Mr. George, do you have any other

3    applications?

4              MR. GEORGE:  Your Honor, I'd like to request that the

5    Court allow my client some time to wrap up his affairs and

6    surrender himself at a later date.

7              THE COURT:  Absolutely.  How much time do you want?

8              MR. GEORGE:  Is it possible for two months, Judge?

9              THE COURT:  Ms. Ravener, any objection?

10             MS. RAVENER:  No, your Honor.

11             THE COURT:  Two months.  Let's get a date certain,

12   Ms. Rivera.

13             THE DEPUTY CLERK:  March 28.

14             THE COURT:  Mr. George, if he is not designated prior

15   to that time, and if you wish to make an application so that he

16   can self-surrender directly to the institution, you can make

17   that application.

18             MR. GEORGE:  Thank you, your Honor.

19             THE COURT:  Anything else?

20             MS. RAVENER:  Nothing further, your Honor.

21             THE COURT:  Mr. George.

22             MR. GEORGE:  No, your Honor.

23             THE COURT:  In that event, we are adjourned.

24             Mr. Dean, good luck to you, sir.

25             (Adjourned)


SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300