

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 19, 2019

<u>**VIA ECF**</u>

The Honorable Edgardo Ramos
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

      Re:    *United States v. Robert Espinel*, **17 Cr. 398 (ER)**

Dear Judge Ramos:

      The Government respectfully submits this memorandum in advance of the sentencing of defendant Robert Espinel, scheduled for April 26, 2019, at 4:00 p.m., in connection with his guilty plea to Count Two of the Indictment for conspiracy to commit bribery. Specifically, Espinel pleaded guilty to conspiring with others upon his retirement from the New York City Police Department ("NYPD") to pay bribes to members of the NYPD's License Division, his former colleagues, in order to secure those members' assistance in approving gun license applications as a means of advancing his own gun license "expediting" business. For the reasons set forth below, an incarceratory sentence consistent with the applicable Guidelines range would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

**I.**     **The Guidelines Range**

      As set forth in the Presentence Report ("PSR"), the parties and the United States Probation Office (the "Probation Office") agree that the defendant falls within Criminal History Category I, the offense level is 15, and the appropriate United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range is 18 to 24 months of imprisonment. (PSR ¶¶ 7(c), 121.)

      The Probation Office recommends a sentence of 18 months of incarceration, the bottom of the Guidelines range. (*See* PSR at 31.) In his sentencing memorandum, the defendant requests that the Court impose a non-incarceratory sentence, based in significant part upon the defendant's positive personal characteristics and history apart from the offense conduct, as well as other factors set forth in Title 18, United States Code, Section 3553(a). (*See* Def. Mem. 23-, 7-15.) These traits, however, cannot eclipse the severity of the defendant's crime. As set forth below, the Government submits that the Court should impose a sentence of incarceration

consistent with the applicable Guidelines range in order to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to adequately deter others from conspiring to commit bribery.

## II.     Applicable Law

The Guidelines continue to provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005), although they are no longer mandatory. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that range "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). As the Second Circuit has noted, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera,* 550 F.3d at 189 (quoting *Gall,* 552 U.S. at 50).

## III.    Discussion

The Government submits that a Guidelines sentence is appropriate in light of the defendant's serious abuse of his position within the NYPD, and corruption of an important

government process intended to protect public safety, namely, the process of regulating who could have access to guns in New York City.

Such a sentence would "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense." *See* 18 U.S.C. § 3553(a)(2)(A). Joining with Paul Dean, his colleague, Espinel planned to retire off a scheme built on paying bribes to his own former NYPD colleagues, David Villanueva and Richard Ochetal. At the time, a number of purported "gun license expediters" were bribing officers at the NYPD's Licensing Division, in exchange for assistance with gun license applications, ushering in rampant corruption. For his part, Espinel accepted gifts – such as free meals and liquor – from gun license holders during this time, and from expediters, Frank Soohoo and Gaetano Valastro. *See, e.g.*, PSR ¶¶ 48, 52. Espinel and Dean planned to further capitalize on this corruption together upon their retirements through the establishment of their own similar bribery scheme designed to compete with these bribe-paying expediters.

Specifically, in order to ensure the success of their business, Espinel and Dean planned to bribe Villanueva and Ochetal to enable their clients to get special treatment from the NYPD. *Id*. at ¶ 29. Espinel and Dean held a meeting with Villanueva and Ochetal at which they pitched this plan in detail, expressing that it would be preferable for Villanueva and Ochetal to take bribes from Espinel and Dean, whom they could trust, rather than from other gun-license expediters. *Id*. at ¶ 30. Espinel and Dean also agreed with Valastro to run their expediting and bribery scheme out of Valastro Academy, Valastro's firearms store, and to steer successful applications to Valastro's store to buy guns as a benefit to Valastro. *Id*. at ¶¶ 29-31. Espinel went so far as to conduct a "dry run" of their expediting strategy for a client, while he was still serving as a NYPD officer. *Id*. at ¶¶ 33-36. This client's application was approved for a gun license within less than three weeks, with Dean's approval, despite the fact that the file contained almost none of the paperwork typically associated with applications for the kind of gun license received. *Id*. at ¶ 35. Espinel and Dean even approached certain competing gun-license expediters – Alex "Shaya" Lichtenstein and Frank Soohoo – to demand they cede business to Dean and Espinel. *See id*. at ¶¶ 41-45. During the approach of Soohoo, Espinel took a gun belt from a rack in Soohoo's store without paying for it. *Id*. at ¶ 42.

In sentencing Dean, Espinel's co-conspirator, this Court remarked on the severe harm caused by this conduct. The schemes perpetrated by the other expediters had placed guns in the hands of those "who should never have received them" by paying bribes and gratuities to obtain gun licenses while circumventing the NYPD's safety checks and procedures. (January 31, 2019 Dean Sentencing Tr. 25). At a minimum, the premise of Dean and Espinel's business was to "get someone's application to the head of a line," above the rest of the public, a practice that the Court recognized as deeply problematic and a "huge red flag." (*Id*. at 24.) As this Court observed, however, Dean and Espinel's scheme to join in this misconduct by themselves bribing their fellow NYPD officers spoke to a fundamental threat: "the corrosive effect of this type of corruption on the public's trust in the police department." (*Id*. at 25.) Despite being sworn to serve and protect the citizens of New York, Espinel and Dean violated the "awesome amount of responsibility" entrusted to them by the public. (*Id*. at 26.) They conspired to further undermine the integrity of the NYPD's Licensing Division, and to personally profit from that corruption.

government process intended to protect public safety, namely, the process of regulating who could have access to guns in New York City.

Such a sentence would "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense." *See* 18 U.S.C. § 3553(a)(2)(A). Joining with Paul Dean, his colleague, Espinel planned to retire off a scheme built on paying bribes to his own former NYPD colleagues, David Villanueva and Richard Ochetal. At the time, a number of purported "gun license expediters" were bribing officers at the NYPD's Licensing Division, in exchange for assistance with gun license applications, ushering in rampant corruption. For his part, Espinel accepted gifts – such as free meals and liquor – from gun license holders during this time, and from expediters, Frank Soohoo and Gaetano Valastro. *See, e.g.*, PSR ¶¶ 48, 52. Espinel and Dean planned to further capitalize on this corruption together upon their retirements through the establishment of their own similar bribery scheme designed to compete with these bribe-paying expediters.

Specifically, in order to ensure the success of their business, Espinel and Dean planned to bribe Villanueva and Ochetal to enable their clients to get special treatment from the NYPD. *Id*. at ¶ 29. Espinel and Dean held a meeting with Villanueva and Ochetal at which they pitched this plan in detail, expressing that it would be preferable for Villanueva and Ochetal to take bribes from Espinel and Dean, whom they could trust, rather than from other gun-license expediters. *Id*. at ¶ 30. Espinel and Dean also agreed with Valastro to run their expediting and bribery scheme out of Valastro Academy, Valastro's firearms store, and to steer successful applications to Valastro's store to buy guns as a benefit to Valastro. *Id*. at ¶¶ 29-31. Espinel went so far as to conduct a "dry run" of their expediting strategy for a client, while he was still serving as a NYPD officer. *Id*. at ¶¶ 33-36. This client's application was approved for a gun license within less than three weeks, with Dean's approval, despite the fact that the file contained almost none of the paperwork typically associated with applications for the kind of gun license received. *Id*. at ¶ 35. Espinel and Dean even approached certain competing gun-license expediters – Alex "Shaya" Lichtenstein and Frank Soohoo – to demand they cede business to Dean and Espinel. *See id*. at ¶¶ 41-45. During the approach of Soohoo, Espinel took a gun belt from a rack in Soohoo's store without paying for it. *Id*. at ¶ 42.

In sentencing Dean, Espinel's co-conspirator, this Court remarked on the severe harm caused by this conduct. The schemes perpetrated by the other expediters had placed guns in the hands of those "who should never have received them" by paying bribes and gratuities to obtain gun licenses while circumventing the NYPD's safety checks and procedures. (January 31, 2019 Dean Sentencing Tr. 25). At a minimum, the premise of Dean and Espinel's business was to "get someone's application to the head of a line," above the rest of the public, a practice that the Court recognized as deeply problematic and a "huge red flag." (*Id*. at 24.) As this Court observed, however, Dean and Espinel's scheme to join in this misconduct by themselves bribing their fellow NYPD officers spoke to a fundamental threat: "the corrosive effect of this type of corruption on the public's trust in the police department." (*Id*. at 25.) Despite being sworn to serve and protect the citizens of New York, Espinel and Dean violated the "awesome amount of responsibility" entrusted to them by the public. (*Id*. at 26.) They conspired to further undermine the integrity of the NYPD's Licensing Division, and to personally profit from that corruption.

This conduct, culminating as it did in Espinel's efforts to become a corrupt expediter himself, represents a remarkably serious offense and abuse of trust – one that interfered with the NYPD's responsibility in a core area of public safety, the proper administration of the City's gun laws.  As a result of the corruption in the License Division, unqualified persons were permitted to obtain guns in New York City, risking tragic consequences.  Espinel's role in perpetuating this grave misconduct warrants just punishment.

General deterrence is also a particularly relevant factor in this case.  It is important that any sentence imposed on the defendant send a message to others that exchanging official power for financial gain will not to be tolerated.  *See* 18 U.S.C. § 3553(a)(2)(B) (sentencing court shall consider the need "to afford adequate deterrence to criminal conduct").  Espinel's own record demonstrates that despite his pride in serving within the NYPD, he grew willing to corrupt that very institution for financial gain.  Other individuals who contemplate committing offenses similar to those of the defendant – whether by offering bribes to public officials, or taking them – should know that such crimes are serious and will not be ignored.  These concerns weigh heavily here, where a substantial sentence is necessary to restore public confidence that the NYPD officers charged with administering the City's gun laws are doing so with integrity and impartiality.

In terms of relative culpability, the evidence indicates that Dean, a NYPD officer who served as the second-in-command of the Licensing Division, bore a greater degree of culpability than Espinel, his subordinate in rank.  In January 2019, this Court sentenced Dean to 18 months' imprisonment.  Yet, Espinel too was a long-serving member of the NYPD who violated his oath to the Department, and to the citizens of New York, by conspiring to corrupt his fellow officers.  Dean and Espinel were partners in this criminal endeavor.  The testaments to his character and his many years of police service, set forth in the defense submission, highlight his many positive traits, but they also demonstrate a plain truth: the public deserved more from a man of Espinel's great potential.  At his core, Espinel may be a man of values, but he set aside those values in the pursuit of greed.

Like Dean, Espinel must face consequences for his participation in this crime.  The defendant's conduct seriously and intolerably impacted a core public trust—the responsibility of sworn law enforcement officers to exercise their authority honestly and impartially, and to make decisions on firearms matters based on the law and the needs and public safety of the city, not on their own personal interests and hope of financial gain.  Espinel's dereliction of duty must be met with a substantial sentence to restore respect for the law, provide just punishment, and deter others.

## IV. Conclusion

      For the reasons set forth herein, the Government submits that an incarceratory sentence consistent with the Guidelines is appropriate in this case.  The Government further requests that the Court impose a fine consistent with the Guidelines.

                Respectfully submitted,

                GEOFFREY S. BERMAN
                United States Attorney

          By: _/s/ Kimberly J. Ravener_
                Kimberly J. Ravener
                Assistant United States Attorney
                Southern District of New York
                (212) 637-2358

Cc:    James Pascarella, Esq., *counsel for defendant* (via ECF)